[No. B192627. Second Dist., Div. Five. Apr. 20, 2007.]

NORMAN K. MORROW, Plaintiff and Appellant, v.
LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents.

## COUNSEL

Parker & Covert and Henry R. Kraft for Plaintiff and Appellant.

Jones Day, Deborah C. Saxe and Geoffrey P. Forgione for Defendants and Respondents.

## OPINION

**KRIEGLER, J.**—On June 1, 2005, the Los Angeles Times reported Jefferson High School principal Norman K. Morrow—plaintiff and appellant in this appeal—would be replaced the next month "amid criticism by city and school district officials over his handling of a spate of student brawls that many say have been fueled by racial tensions." Local Superintendent Rowena LaGrosa of the Los Angeles Unified School District (LAUSD) reportedly stated that Morrow would be replaced six months before his planned retirement. The newspaper further related that Superintendent of Schools Roy Romer "voiced the need for stronger leadership at Jefferson, saying in an interview that Morrow 'had retirement plans that did not fit with the district's needs.' The principal's handling of the recent violence had 'accelerated' a decision to replace him, Romer said."

Morrow sued the school district, Romer, and LaGrosa alleging that their statements to the press invaded his privacy (the first cause of action) and defamed him (the sixth cause of action). The trial court granted defendants' motion to dismiss the invasion of privacy and defamation causes of action pursuant to Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[1] Morrow timely appeals, contending the trial court erred in finding: (1) the dismissed causes of action arose from defendants' constitutionally protected speech activity; and (2) Morrow failed to demonstrate a probability of prevailing on either claim. In connection with these arguments, Morrow challenges the trial court's evidentiary rulings that struck numerous statements from the two declarations Morrow submitted in opposition to the anti-SLAPP motion. Finally, he argues the trial court's award of attorney fees to defendants should be reversed. We affirm, finding the challenged statements were constitutionally protected, revealed no private information, and the trial court did not abuse its discretion in making its evidentiary rulings or in ordering attorney fees.

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [3 Cal.Rptr.3d 636, 74 P.3d 737].) An order granting or denying a special motion to strike under Code of Civil Procedure section 425.16 is appealable. (Code Civ. Proc., § 904.1, subd. (a)(13).)

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

*Plaintiff's Allegations*

Morrow became the principal of Jefferson High School in 2001, after serving with distinction as principal of several inner city schools. Jefferson had traditionally been a low-achieving secondary school. Under his leadership, numerous improvements were made to the school and Jefferson's academic standing improved significantly. A series of violent campus disturbances among students occurred on April 14, April 18, and May 24, 2005. Several students were injured; others were arrested. According to Morrow, Romer and LaGrosa falsely blamed him for the disturbances, which he attributed to defendants' failure to provide Jefferson with sufficient security personnel—despite his repeated requests. In essence, Morrow alleged defendants invaded his privacy and defamed him by making statements to a reporter that were published in a Los Angeles Times report on June 1, 2005 (some of which were repeated in a June 15 report). The statements were critical of his handling of the incidents and disclosed Morrow's purported retirement plans. Morrow was removed as principal of Jefferson and reassigned to a "desk job" within the school district. He retired on January 27, 2006, having been "forced out" of the district. He alleges that the negative comments by Romer and LaGrosa, along with the decision to remove him as principal of Jefferson, caused him humiliation, embarrassment, pain and suffering, and damage to his professional reputation resulting in pecuniary losses.

With regard to his invasion of privacy claim, Morrow alleged that defendants' disclosures to the Los Angeles Times concerning his handling of the campus disturbances amounted to a "performance evaluation," which should have been conducted in a closed session of the school board pursuant to Government Code section 54957. In his defamation claim, Morrow alleged Romer wrongfully made the following false and damaging statements to the Los Angeles Times reporter, which were published in the newspaper stories on June 1 and 15: (1) stronger leadership was needed at Jefferson (implicitly disparaging Morrow's leadership ability); (2) Morrow "had retirement plans that did not fit with the District's needs"; and (3) Morrow's handling of the April and May 2005 disturbances had "accelerated" a decision to replace him.[2]

---

[2] Although Morrow alleged that LaGrosa and Romer both made false and disparaging statements to the public regarding him and his leadership abilities, the only statements he identifies are those attributed to Romer in the June 1 and 15 newspaper reports.

*Defendant's Evidence*

In support of their anti-SLAPP motion, defendants submitted declarations by LaGrosa and Romer. LaGrosa stated that at the time of the relevant incidents, she was superintendent of the local district responsible for Jefferson. She was one of Morrow's supervisors; Romer was LaGrosa's supervisor. She "spent a lot of time" at Jefferson following the riots and formed the opinion that Morrow was not providing strong leadership and should be replaced at the end of the school year. LaGrosa informed Romer that her decision to replace Morrow was based on Morrow's handling of the student disturbances. She met with Morrow after the second or third student fracas "to discuss his future plans." LaGrosa told Morrow that she had heard he was planning to retire from the school district and was looking for a new job. Morrow said he did plan to retire, but for financial reasons did not want to leave the district until January 2006. According to LaGrosa, Morrow assumed she "probably would want a new team in place" by the start of the new school year in July, rather than have to replace Morrow the following January. LaGrosa agreed and told Morrow that she would find him a position elsewhere in the district at his current salary until January.[3]

Romer, as Superintendent of Schools for the LAUSD, had an official duty to communicate with the press about matters of public concern. More specifically, in the event of incidents of student violence, it was his "official duty to let the general public know what the LAUSD [was] going to do about it." Following the violent episodes on the Jefferson campus in April and May 2005, Romer concluded Morrow had been unsuccessful in controlling the students, and "because of the way he handled the student disturbances, [Morrow] had to be replaced at the end of the 2004–2005 school year." Romer understood that Morrow intended to retire, but he was aware of no plan to replace Morrow prior to the student disturbances. LaGrosa informed Romer that she had decided to replace Morrow at the end of the school year because of his handling of those disturbances. It was Romer's "opinion that Mr. Morrow had to be replaced in June because stronger leadership was needed at Jefferson right away."

In late May 2005, Romer agreed to an interview with a Los Angeles Times reporter "because [he] considered the student disturbances at Jefferson to be of concern to the public and [he] knew that the public wanted to know what

---

[3] In his opposition declaration, Morrow denied that he and LaGrosa discussed "finances" during their "very short conversation." He also denied telling LaGrosa that he understood she would want a "new team" in place before the start of the new school year. According to Morrow, LaGrosa began their conversation by telling him that "she felt it would be best if a new team were in place since [Morrow] would only be able to remain with LAUSD until January 2006."

the District would do about it." Romer told the reporter that the high school "needed stronger leadership," that Morrow would be replaced as principal, and that Morrow's handling of the student disturbances had "accelerated" the decision to replace him. Romer also told the reporter that Morrow's retirement plans "did not fit with the District's needs"—meaning the district needed to replace Morrow at the end of the school year, prior to Morrow's planned retirement date.

*Plaintiff's Evidence*[4]

Michael O'Sullivan, Ed.D., president of the Associated Administrators of Los Angeles (AALA) and longtime school district employee, provided a declaration supporting Morrow's opposition to defendants' anti-SLAPP motion. O'Sullivan's declaration was admitted as evidence from a percipient witness rather than as an expert witness. According to O'Sullivan, Morrow was an AALA member at the time of the Jefferson incidents and defendants' decision to replace him as principal. The collective bargaining agreement (CBA) in effect between AALA and LAUSD established the procedural due process rights of district administrators such as Morrow under article VII of that agreement, which was "the exclusive mechanism for evaluating the performance of and disciplining of the certificated supervisory unit . . . for poor performance." At no time did any of the defendants invoke article VII as to Morrow. O'Sullivan was never contacted by any of the defendants about Morrow's job performance. O'Sullivan understood that Morrow has an outstanding reputation in the LAUSD academic community with regard to his truthfulness and his job performance.

In Morrow's own declaration, he stated that he was a member of AALA at all relevant times and that the AALA was the exclusive representative of certificated supervisors. The CBA established the exclusive procedure for taking personnel actions against members. Morrow considered his job performance and retirement plans to be "highly personal" and expected any questions concerning them to be addressed pursuant to article VII of the CBA. Morrow also summarized his employment history with the district, including his efforts to improve academic performance and security at Jefferson—and the ways in which defendants' ignored or hindered many of those efforts. Morrow attributed the outbreak of student violence to defendants' failure to heed his warnings and believed that defendants were unfairly placing the blame on him.

---

[4] We discuss only the statements deemed admissible by the trial court. As discussed *post*, we find the trial court's evidentiary rulings entirely proper.

Concerning his retirement plans, Morrow explained that he had no desire to leave Jefferson. In December 2004, prior to the student disturbances, he began making retirement plans because his direct supervisor told him LaGrosa intended to replace him as principal. The fact that Morrow had not received a district performance evaluation that year was consistent with an intent to replace him. Morrow could not remember the persons he spoke to about retirement prior to the disturbances, but they did not include LaGrosa. He did not speak to her until May 31, 2005, when she was visiting the high school. She approached Morrow in front of the cafeteria and told him she was speaking to Romer on her cellular phone. The superintendent was being interviewed by a Los Angeles Times reporter. LaGrosa asked Morrow if he had told anyone he was "planning to retire." Morrow said that he had spoken to his "administrative team" and direct supervisor in January, but only because he had heard that LaGrosa wanted to replace him. According to Morrow, in June 2005, Romer apologized to Morrow for making the statements to the press concerning Morrow's job performance, stating that he "got false information."

According to Morrow, defendants lacked any basis for transferring him from Jefferson. He declared that Romer's statements and defendants' actions compelled him to retire seven years earlier than he had originally planned. He also attributed loss of income and earning capacity to those statements and actions. He is currently employed, but receiving less compensation and fewer benefits.

*The Newspaper Reports*

The June 1, 2005 Los Angeles Times article began: "The principal of Jefferson High School agreed Tuesday to step down amid criticism by city and school district officials over his handling of a spate of student brawls that many say have been fueled by racial tensions. [¶] Principal Norm Morrow will be replaced at the troubled South Los Angeles campus on July 1, six months before he planned to retire, said Rowena LaGrosa, the Los Angeles Unified School District local superintendent who met with Morrow on Tuesday to finalize the change. [¶] The move came on a day when Los Angeles Mayor-elect Antonio Villaraigosa[5] and schools Supt. Roy Romer expressed concerns over Morrow's ability to lead." The report explained that the mayor-elect had visited the previous week, the day after "police broke up a campus brawl involving more than 20 students. It was the third fight in the

---

[5] The mayor was quoted as saying that he had the sense that "things were out of control," and "I do not get the sense that anyone was in charge." The mayor is not a defendant in this lawsuit.

past six weeks at the school . . . . [¶] The events at Jefferson have unfolded amid other violent outbreaks on several campuses in the city and elsewhere in Southern California. While the fighting at many schools has occurred between [B]lacks and Latinos, district officials have cautioned that factors other than race, such as overcrowding, have also played a role in the violence. [¶] Romer also voiced the need for stronger leadership at Jefferson, saying in an interview that Morrow 'had retirement plans that did not fit with the district's needs.' The principal's handling of the recent violence had 'accelerated' a decision to replace him, Romer said." According to the report, Morrow "declined to comment Tuesday morning on his retirement plans" and "could not be reached after his meeting with LaGrosa."

On June 15, the Los Angeles Times reported that school district officials had hired a new principal, who would replace Morrow on July 1. "The hiring comes two weeks after district Supt. Roy Romer announced that Morrow would be replaced at Jefferson six months before his retirement amid criticism over his handling of the outbreaks of violence on campus. Morrow will be transferred to another district position. [¶] Romer said in a recent interview that the principal's management of the recent violence 'accelerated' a decision to replace him. [¶] . . . [¶] The changes come after three melees, the first involving more than 100 students near the school's cafeteria. Three students were hurt. [¶] In the second, more than 100 [B]lack and Latino students fought in a brawl that officials said had links to a gang dispute. Six students were detained and two of them were arrested. Another suffered a broken hip. [¶] The third fight, involving about 20 students, occurred on the eve of a planned 'Day of Dialogue' event that district officials had scheduled after the first two brawls."

*The Trial Court's Ruling*

The trial court found Government Code section 54957 did not proscribe Romer from discussing Morrow's performance outside a closed school board hearing. The trial court also found neither Romer nor LaGrosa revealed any private information concerning Morrow. Alternatively, to the extent any private information was revealed, the disclosure was privileged. "A principal's leadership or lack thereof in handling student violence and melees on a campus is the subject of legitimate public concern." Romer, in his role as superintendent, had an official obligation to make a public report concerning the outbreak of violence at Jefferson. Pursuant to that official duty, Romer properly used a public forum to express his concern that Jefferson have a "principal who could handle and eliminate the violence." "There is no doubt that school violence is an issue of public concern, and discussion of such violence in a newspaper is a public forum and I think that the statements appear to have been . . . pretty circumspect" under the circumstances.

## DISCUSSION

## THE TRIAL COURT PROPERLY GRANTED
## DEFENDANTS' SPECIAL MOTION TO STRIKE

■ Morrow argues his invasion of privacy and defamation claims were not subject to the anti-SLAPP statute because the statements by Romer and LaGrosa were not constitutionally protected, but even if they were, he made a sufficient factual showing of a probability of prevailing on those two claims to overcome defendants' anti-SLAPP motion. We hold that none of the challenged statements divulged private information, but rather amounted to constitutionally privileged comment by a public officer in the proper discharge of an official duty under Civil Code section 47, subdivision (a). Accordingly, Morrow's claims were subject to an anti-SLAPP motion. Moreover, the defamation claim independently failed because the challenged statements constituted either nonactionable opinions or nondefamatory statements of fact.

■ "In evaluating an anti-SLAPP motion, the trial court first determines whether the defendant has made a threshold showing that the challenged cause of action arises from protected activity. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].) Under Code of Civil Procedure section 425.16 '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . shall be subject to a special motion to strike. . . .' (Code Civ. Proc., § 425.16, subd. (b)(1).)" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 [39 Cal.Rptr.3d 516, 128 P.3d 713].) "If the court finds the defendant has made the threshold showing, it determines then whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th at p. 67.) 'In order to establish a probability of prevailing on the claim ([Code Civ. Proc.,] § 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must " 'state[] and substantiate[] a legally sufficient claim.' " [Citations.] Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.]' (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].)" (*Rusheen v. Cohen, supra*, 37 Cal.4th at p. 1056.) "[A] plaintiff opposing a [Code of Civil Procedure] section 425.16 motion must support its claims with admissible evidence." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1237 [132 Cal.Rptr.2d 57].)

We independently review both the question of whether Morrow's causes of action arise from protected activity and whether he has shown a probability of prevailing on the merits. (*Greka Integrated, Inc. v. Lowrey* (2005) 133 Cal.App.4th 1572, 1577 [35 Cal.Rptr.3d 684]; *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1396 [126 Cal.Rptr.2d 560]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625].)

*Protected Activity*

The Code of Civil Procedure provides that for purposes of an anti-SLAPP motion, an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes . . . any written or oral statement or writing made in . . . a public forum in connection with an issue of public interest . . . or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e).) Morrow argues the statements to the Los Angeles Times concerning his handling of the student violence, leadership abilities, and retirement plans did not concern an issue of public interest, but were private personnel details that could be divulged only within a formal personnel evaluation subject to the protections of the CBA. Like the trial court, we disagree.

Morrow concedes—as he must—that the incidents of student violence on the Jefferson campus were of public interest. These were very serious incidents. The Los Angeles Times published the following account: "The first brawl involved about 100 students near the cafeteria. Three students were hurt. In the second, more than 100 [B]lack and Latino students got into another lunchtime fight that officials said had links to a gang dispute. Six students were detained and two of them were arrested. Another student suffered a broken hip." Prior to the June 1 and 15 reports, the Los Angeles Times had run at least seven articles on the outbreaks of violence at Jefferson, quoting Morrow in most of them as to his assessment of the incidents and plans to respond to them. The Los Angeles Times also reported that the police chief, mayor, and mayor-elect visited the campus in response to the incidents. The events undeniably were of at least citywide concern and—notwithstanding Morrow's assertions to the contrary—as Jefferson's principal, Morrow was at the center of the story. (See *BRV, Inc. v. Superior Court* (2006) 143 Cal.App.4th 742, 757 [49 Cal.Rptr.3d 519] ["Without doubt, the public has a significant interest in the professional competence and conduct of a school district superintendent and high school principal"]; *Leventhal v. Vista Unified School Dist.* (S.D.Cal. 1997) 973 F.Supp. 951, 958 ["Debate

over public issues, including the qualifications and performance of public officials (such as a school superintendent), lies at the heart of the First Amendment"].)

Nevertheless, Morrow contends the challenged statements did not concern the student violence, but merely revealed matters of private interest—his retirement plans and the reasons for a personnel action. A fair reading of the relevant newspaper articles shows, however, Morrow's assertion is untenable. While it is possible to imagine an instance in which a school administrator's retirement plans would be of purely private interest, that was not the case here. To the contrary, Romer and LaGrosa only mentioned Morrow's retirement plans to the extent they directly concerned the school district's solution to the student violence. There is no evidence that any gratuitous details were offered to the press and certainly none were published.

We find the analysis by the federal appeals court in *Stevens v. Tillman* (7th Cir. 1988) 855 F.2d 394 to be instructive. There, plaintiff Stevens, an elementary school principal, sued the president of a parent-teacher association and her supporters for a variety of claims including defamation. In the course of finding the principal was a public figure for purposes of the *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279–286 [11 L.Ed.2d 686, 84 S.Ct. 710] standard, the Seventh Circuit explained: "Stevens was not an elected public official, but as principal she possessed great discretion over the operation of Mollison School. How she used that discretion was the subject of legitimate public debate. . . . The statements at issue here dealt with the way Stevens ran Mollison School, not with her private life." (*Stevens v. Tillman, supra,* 855 F.2d at p. 403.) The same was true of Morrow.[6]

Morrow erroneously claims the CBA proscribed Romer from making the challenged statements, except in a closed session of the board of education. As the CBA recognizes in article V, however, the district retains all rights not enumerated in the CBA or otherwise placed outside the CBA's scope by Government Code section 3543.2. That code section limits the CBA's scope of representation "to matters relating to wages, hours of employment, and other terms and conditions of employment," and its definition of "terms and conditions of employment" does not encompass the right of the district's executive officers to make public comments on a represented administrator's performance when it impacts on issues of public concern. (Gov. Code,

---

[6] Morrow mistakenly attempts to rely on the holding in *Garcetti v. Ceballos* (2006) 547 U.S. 410 [164 L.Ed.2d 689, 126 S.Ct. 1951] that when public employees make statements pursuant to an official duty, they are not speaking as citizens for First Amendment purposes. The decision in *Garcetti,* however, did not deal with a government official's public comments on official matters, but rather the question of the extent to which a public employer may discipline a public employee for making statements in the course of the employee's official duties.

§ 3543.2, subd. (a) ["All matters not specifically enumerated are reserved to the public school employer and may not be a subject of meeting and negotiating"].) Moreover, the CBA identifies the right to "assign personnel to any location" as one of the rights *retained* by the school district. In short, the challenged statements were not the kind of formal personnel evaluation contemplated by article VII of the CBA. (Cf. *Bellflower Education Assn. v. Bellflower Unified School Dist.* (1991) 228 Cal.App.3d 805, 812 [279 Cal.Rptr. 179] ["the subject of the grievance, violation of bargained-for evaluation procedures, is within the allowable scope of collective bargaining under the Government Code"].)

 Morrow argues the "personnel exception" in the Ralph M. Brown Act (Gov. Code, § 54950 et seq.; Brown Act) created a right to privacy that covered the information provided to the press. The personnel exception, found in Government Code section 54957, "authorizes a local legislative body to hold a closed session to consider 'personnel matters,' which the statute defines as the appointment, employment, evaluation of performance, discipline, or dismissal of a public employee. It also authorizes a local legislative body to hold a closed session to hear complaints or charges brought against a public employee by another person or employee, 'unless the employee requests a public session.' Paragraph two of section 54957 sets forth the notice that a local legislative body must provide to the employee '[a]s a condition to holding a closed session on specific complaints or charges brought against an employee by another person or employee[.]' [¶] The purposes of the personnel exception are (1) to protect employees from public embarrassment and (2) to permit free and candid discussions of personnel matters by a local governmental body. This exception should be narrowly construed." (*Fischer v. Los Angeles Unified School Dist.* (1999) 70 Cal.App.4th 87, 96 [82 Cal.Rptr.2d 452].)

The personnel exception is inapplicable, as stated above, because defendants' statements were not the equivalent of a personnel evaluation under the CBA.[7] In addition, Morrow's argument turns the Brown Act on its head, because the general purpose of the Brown Act is to *increase* public awareness of issues bearing on the democratic process. "The Brown Act requires open public meetings and gives people the right to attend meetings of local legislative bodies, subject to statutory exceptions. [Citation.] The Brown Act establishes the general rule that 'meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter.' ([Gov. Code,] § 54953, subd. (a).) The Brown Act

---

[7] We also note that to the extent Morrow argues the district violated article IX of the CBA through it handling of his transfer, paragraph 1.9 of that provision states that such administrative staffing procedures "are not subject to the grievance/arbitration process."

has the objective of facilitating public participation in local government decisions and curbing misuse of the democratic process by secret legislation." (*Fischer v. Los Angeles Unified School Dist., supra*, 70 Cal.App.4th at p. 95.)

The statute's plain meaning, as bolstered by the Brown Act's overarching purpose and the requirement that the personnel exception be read narrowly, forecloses an interpretation that would equate the kind of generalized criticism Romer made to the press with a formal "evaluation of performance" as contemplated under Government Code section 54957. Stated another way, as a federal district court pointed out, while the Brown Act "allows public employees to demand that a governing body air complaints about the employee in public, it does not grant the employees the right to force the conflict behind closed doors." (*Leventhal v. Vista Unified School Dist., supra*, 973 F.Supp. at p. 958.) Indeed, if the CBA or the Brown Act proscribed Romer from making the challenged statements to the press, there would be a serious question as to the constitutionality of either.[8] (See 973 F.Supp. at pp. 956–960 [school board bylaws imposing restrictions on raising "complaints" against school district employees at open board meetings, when applied to cover even informal criticism, violated the First Amendment, despite the contention that the public's expressive rights were outweighed by the school district's interest in protecting privacy and property rights of employees].)

*Probability of Prevailing on the Merits*

■ Having found the invasion of privacy and defamation causes of action arose from protected free speech activity, we proceed to the question of whether Morrow has demonstrated a probability of prevailing on those claims based on admissible evidence. " 'In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant ([Code Civ. Proc.,] § 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' (*Wilson v. Parker, Covert & Chidester, supra*, 28 Cal.4th [at p.] 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].)" (*Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 317–318 [126 Cal.Rptr.2d 516]; see also *Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th at p. 741, fn. 10.)

---

[8] Morrow's attempt to rely on the California Public Records Act as a basis for supporting his claimed privacy invasion does not merit extensive discussion, as Morrow does not allege or present evidence that defendants disclosed confidential information from his personnel files.

 To prevail on a claim for invasion of privacy by means of the publication of private facts, Morrow must prove a (1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to a reasonable person, and (4) which is not of legitimate public concern. (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 214 [74 Cal.Rptr.2d 843, 955 P.2d 469].) As our Supreme Court explains, "lack of newsworthiness is an element of the 'private facts' tort, making newsworthiness a complete bar to common law liability." (*Id.* at p. 215.) The assessment of that question "involves accommodating conflicting interests in personal privacy and in press freedom as guaranteed by the First Amendment to the United States Constitution." (*Ibid.*) As long as the publication was of "legitimate public concern," there can be no tort liability under this theory where the facts disclosed "bear a logical relationship to the newsworthy subject of the broadcast and are not intrusive in great disproportion to their relevance"—even if the subject of disclosure was "a private person involuntarily caught up in events of public interest." (*Ibid.*)

Our protected activity analysis demonstrated both the legitimate newsworthiness of the challenged publication and the lack of any legally protected privacy interest in the information disclosed to the press. It follows that Morrow cannot prevail on his privacy invasion claim. The trial court was correct in finding that to the extent the challenged disclosures included any private fact, the disclosure was logically relevant to the newsworthy subject of the violence at Jefferson and the school district's response to it. Even if Morrow's retirement plans were considered to be a purely private concern, the disclosure was highly relevant to the district's response and not particularly intrusive.

Morrow's defamation claim fares no better because the challenged statements were protected by the executive officer privilege of Civil Code section 47, subdivision (a). "Enacted in 1872, the statute states simply: 'A privileged publication or broadcast is one made: (a) In the proper discharge of an official duty.' The annotation to the section made by the Code Commission in 1872 indicated that it was intended 'as a codification of the general principles developed by the courts.' (*Saroyan v. Burkett* (1962) 57 Cal.2d 706, 710 [21 Cal.Rptr. 557, 371 P.2d 293] [(*Saroyan*)].) At the time of its enactment, the legal authorities cited by the Code Commission recognized an absolute privilege only in judicial and legislative proceedings. Twenty years later, the United States Supreme Court applied the privilege to the executive branch of government, holding a communication of the Postmaster General to be absolutely privileged. (*Spalding v. Vilas* (1896) 161 U.S. 483 [40 L.Ed. 780, 16 S.Ct. 631].)" (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 839–840 [52 Cal.Rptr.2d 831] (*Copp*).).

The privileged nature of Romer's statements cannot be seriously doubted in light of the leading decisions of the California and United States Supreme Courts. In *Saroyan*, our Supreme Court followed the precedent of its federal counterpart to bar a defamation suit against the state Superintendent of Banks by an employee who alleged he was defamed by the superintendent's statements to the press relating to his conduct as attorney for the state banking department. The *Saroyan* court extended the executive privilege "to state officials corresponding in rank to federal cabinet members. Defendant [Superintendent of Banks] was such an official. . . . [He] was acting in the exercise of an executive function when he defended the policy of his department, and his statements were related to the defense of that policy. Accordingly defendant was protected by an absolute privilege." (*Saroyan, supra*, 57 Cal.2d at pp. 710–711; see also *Kilgore v. Younger* (1982) 30 Cal.3d 770, 779 [180 Cal.Rptr. 657, 640 P.2d 793] [extending privilege to state Attorney General sued for defamation after releasing a report on organized crime naming the plaintiff as a person suspected of criminal activity]; *Copp, supra*, 45 Cal.App.4th at p. 840 [extending privilege to county emergency services coordinator sued for defamation]; *Royer v. Steinburg* (1979) 90 Cal.App.3d 490, 500–501 [153 Cal.Rptr. 499] [extending privilege to school board trustees who passed an allegedly defamatory motion charging the plaintiff, a former superintendent of schools, with improper election activities].)

■ While some appellate decisions have refused to apply the privilege to officials below cabinet rank (e.g., *Frisk v. Merrihew* (1974) 42 Cal.App.3d 319, 323 [116 Cal.Rptr. 781] [denying immunity to school superintendent and school board secretary]), we agree with our colleagues in the First District "that the weight of authority follows federal precedents in extending the privilege to lower ranking officials." (*Copp, supra*, 45 Cal.App.4th at p. 840.) Most significantly, in the federal Supreme Court's leading decision, *Barr v. Matteo* (1959) 360 U.S. 564 [3 L.Ed.2d 1434, 79 S.Ct. 1335] (lead opn. of Harlan, J.) (*Barr*),[9] the absolute privilege was extended to the "Acting Director of the Office of Rent Stabilization—an office well below cabinet rank." (*Copp, supra*, 45 Cal.App.4th at p. 841; see *Barr, supra*, 360 U.S. at p. 572, fn. omitted ["We do not think that the principle announced in [*Spalding v.*] *Vilas*[, *supra*, 161 U.S. 483] can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts."].)

As the Supreme Court explained in *Barr*: "It is not the title of his office but the duties with which the particular officer sought to be made to respond in

---

[9] Justice Harlan authored the lead opinion in *Barr*, which was joined by three justices. Justice Black concurred in the result reached by the lead opinion, but on more expansive First Amendment grounds.

damages is entrusted . . . which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits." (*Barr, supra,* 360 U.S. at pp. 573–574.) Indeed, the published statement found privileged in *Barr* cannot be meaningfully distinguished from that made by Romer. In that case, there was a widely reported scandal developing in a federal administrative agency concerning its employees' accumulated leave payments. The defendant, the acting director of the agency, suspended two of his subordinates and released a press release "implying in a press release that they were responsible for the misdeeds." (*Royer v. Steinburg, supra,* 90 Cal.App.3d at p. 501, citing *Barr, supra,* 360 U.S. at p. 567.) In finding the defendant's statements absolutely privileged, the Supreme Court stated: "We think that under these circumstances a publicly expressed statement of the position of the agency head, announcing personnel action which he planned to take in reference to the charges so widely disseminated to the public, was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." (*Barr, supra,* 360 U.S. at pp. 574–575.) Romer, in his capacity as the chief executive officer of the governing board of the district (Ed. Code, § 35035, subd. (a)), announced the impending transfer of a district employee as part of the school district's response to a notorious crisis in a public high school.

Morrow argues the executive privilege cannot apply to Romer because he was not exercising a policymaking function when he made the challenged statements. Consistent with the decisions in *Saroyan* and *Barr,* however, the executive privilege broadly "encompass[es] all discretionary acts essential to the proper exercise of an executive function" decision. (*Copp, supra,* 45 Cal.App.4th at p. 844.) As such, we find Morrow's reliance on *Neary v. Regents of University of California* (1986) 185 Cal.App.3d 1136 [230 Cal.Rptr. 281] (*Neary*) and *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406 [134 Cal.Rptr. 402, 556 P.2d 764] (*Sanborn*) misplaced. In *Neary,* a University of California vice-chancellor released a veterinarian's report investigating dead cattle at the plaintiff's ranch. In *Sanborn,* a county clerk told the press that he had been "conned" by the plaintiff to release funds improperly. "In those cases, the privilege was determined not to apply to the defendants' acts because they were not made in furtherance of any policymaking function. Essentially, the release of the veterinarian's report in *Neary* was ministerial and divorced from any policymaking role the vice chancellor might have had. Likewise, the county clerk in *Sanborn* had no policymaking function relating to the release of funds." (*Tutor-Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 616 [39 Cal.Rptr.3d 21].) Here, in contrast, Romer's statements to the press cannot be deemed ministerial or unrelated to

a legitimate policymaking function. Rather, as superintendent he was publicly explaining the district's response to a matter of widespread concern, which was one of his official duties.

Finally, evidence that Romer later regretted his decision to replace Morrow, believing it to have been based on "false evidence," in no way precludes application of the privilege. In *Barr*, the Supreme Court relied heavily on Judge Learned Hand's explication of the rationale for the executive privilege, as expressed in *Gregoire v. Biddle* (2d Cir. 1949) 177 F.2d 579: " 'Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .' "[10] (*Barr, supra*, 360 U.S. at pp. 571–572, quoting *Gregoire v. Biddle, supra*, 177 F.2d at p. 581.)

■ Because Romer's statements were protected by the executive officer privilege of Civil Code section 47, subdivision (a), we find Morrow failed to discharge his burden of demonstrating a probability of prevailing on his defamation claim. Given that finding, we need not address in great detail the question of whether the challenged statements were defamatory. As a matter of constitutional law, to be actionable, a defamatory statement must contain a false statement of fact, rather than opinion. " 'However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.' [Citation.] A statement of opinion, however, may still be actionable 'if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.' [Citations.] 'The dispositive question for the court is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion. . . .' [Citations.] [¶] The issue whether a communication was a statement of fact or opinion 'is a question of law to be decided by the court.' [Citation.]" (*Copp, supra*, 45 Cal.App.4th at p. 837.)

---

[10] Of course, we imply no finding as to the propriety of Romer's actions or his judgment regarding Morrow's performance or his evaluation of the school district's needs. Upon the evidence properly before the trial court, the *most* Morrow showed was that in retrospect Romer believed he had made an honest mistake.

As an alternative basis for our decision, we find Romer's reported statements that (1) Jefferson needed "stronger leadership," (2) Morrow's retirement plans that did not " 'fit with the district's needs,' " and (3) Morrow's "handling of the recent violence had 'accelerated' a decision to replace him" were all protected opinions. (See, e.g., *Botos v. Los Angeles County Bar Assn.* (1984) 151 Cal.App.3d 1083, 1089 [199 Cal.Rptr. 236] [county bar's finding attorney was "not qualified" to sit as a judge was nonlibelous as a matter of law: "As a collective judgment of his qualifications, it may have ranged from being well founded to utterly wrong," but it remained a protected opinion]; *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 725 [275 Cal.Rptr. 494] [finding no cause of action for statement in a high school newspaper that the plaintiff was " 'the worst teacher at FHS' " because it was "an expression of subjective judgment"].)

*Evidentiary Claims*

Morrow contends the trial court erroneously excluded various statements from the two declarations he submitted in opposition to defendants' anti-SLAPP motion. As stated above, "a plaintiff opposing a [Code of Civil Procedure] section 425.16 motion must support its claims with admissible evidence." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist., supra,* 106 Cal.App.4th at p. 1237.) We review the trial court's evidentiary rulings for an abuse of discretion (e.g., *Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1169 [121 Cal.Rptr.2d 79]) and find none.

The trial court ruled four of O'Sullivan's statements were inadmissible—the witness's assertions that: (1) the CBA proscribes Romer and LaGrosa from making statements to the press about personnel matters such as job performance and retirement plans; (2) "District officials" have recognized in discussions that personnel matters may only be discussed in a closed session of the school board, subject to the provisions of the Brown Act; (3) Romer's statements to the press regarding Morrow were "false and unfortunate"; and (4) Romer knew that making those statements was proscribed by the California Constitution, the Brown Act, and the CBA.

The trial court's rulings were entirely proper. The first statement amounts to an improper lay opinion as to the meaning and legal effect of a contract. "Our Supreme Court long ago established '[t]he interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] . . . It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' [Citation.]" (*Powers v.*

*Dickson, Carlson & Campillo* (1997) 54 Cal.App.4th 1102, 1111 [63 Cal.Rptr.2d 261].) The second statement is also an improper lay opinion (as well as hearsay and irrelevant) because it amounts to the opinions of unnamed officials as to a legal conclusion. ■ The manner in which the law should apply to particular facts is a legal question and is not subject to expert, much less lay, opinion. (See, e.g., *Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1179 [82 Cal.Rptr.2d 162].) The third statement also amounts to an improper lay opinion as well as a conclusion without proper foundation. The fourth statement suffers from the same vice, but compounds it by purporting to relate another person's state of mind without any showing of personal knowledge thereof. (Evid. Code, § 702.)

Nor was there any abuse of discretion in the trial court's evidentiary rulings on Morrow's declaration. The trial court struck the following assertions by Morrow as to Romer and/or LaGrosa: (1) Romer's motive for making the challenged statements to the press was to deflect criticism away from defendants' bad management decisions; (2) Romer was responsible for knowing the privacy rights granted to the school district's administrative employees under the California Constitution, the Brown Act, the Public Records Act, Government Code section 6254, and the CBA; (3) Romer, by virtue of his being a state governor and a licensed attorney, knew the personal privacy concerns of the district's employees; (4) the "CBA does not authorize LAUSD . . . to comment on personnel matters"; (5) Romer and LaGrosa's "lack of interest and supervision" concerning Jefferson demonstrated that they intended to "set-up" the high school to "fail"; (6) Romer and LaGrosa knew "any discussion" concerning Morrow's performance required a closed session performance evaluation under Government Code section 54957 and article VII of the CBA; (7) LaGrosa's motivation for replacing Morrow was to "bring in younger Hispanics"; (8) in the context of Romer's apology, both Morrow and the superintendent understood that the source of the "false and misleading information" was LaGrosa.

Statements 2, 3, 4, and 6 were improper lay opinions as to legal conclusions. (See *Summers v. A. L. Gilbert Co., supra*, 69 Cal.App.4th at p. 1179.) The same is true of Morrow's statement that he "understood that any discussions regarding possible retirement or personnel matters were highly confidential." Statements 1 through 3 and 5 through 8 amounted to opinions as to the mental impressions of other persons without personal knowledge thereof. (See Evid. Code, § 702.) The same is true of various other of Morrow's stricken assertions—that prior to the campus disturbances, neither Romer nor LaGrosa visited Jefferson, that neither one had ever observed his performance or received reports that Morrow's performance was "less than stellar," and that Romer had not spoken to Morrow's administrative

staff, Jefferson teachers, parents, students, or security personnel. Such testimony is obviously beyond the witness's personal knowledge and is rife with speculation.

*Attorney Fees*

 The successful defendant on an anti-SLAPP motion is entitled to recover its attorney fees and costs as a matter of right. (Code Civ. Proc., § 425.16, subd. (c); *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131 [104 Cal.Rptr.2d 377, 17 P.3d 735] ["any SLAPP defendant who brings a successful motion to strike is entitled to mandatory attorney fees"].) Nevertheless, as we explained in *Endres v. Moran* (2006) 135 Cal.App.4th 952 [37 Cal.Rptr.3d 786] (*Endres*), when a successful anti-SLAPP motion accomplishes nothing of practical consequence—that is, where the "results of the motion were minimal and insignificant," a trial court is justified in finding the defendants should not recover fees. (*Id.* at p. 955; *Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 340 [42 Cal.Rptr.3d 607] (*Mann* ) ["a party who partially prevails on an anti-SLAPP motion must generally be considered a prevailing party unless the results of the motion were so insignificant that the party did not achieve any practical benefit from bringing the motion. The determination whether a party prevailed on an anti-SLAPP motion lies within the broad discretion of a trial court"].)

Morrow cannot take advantage of the narrow exception recognized in *Endres* and *Mann* because he does not offer any legal or factual basis for finding that the practical effect of defendants' victory was nugatory. Dismissal of the causes of action for defamation and invasion of privacy cannot be considered trivial victories for defendants in the context of this case.

Defendants ask that we award attorney fees on appeal. The right to attorney fees extends to attorney fees on appeal as well. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 659 [49 Cal.Rptr.2d 620], overruled in part on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th at p. 68, fn. 5; *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785 [54 Cal.Rptr.2d 830].) Defendants, having prevailed as to the invasion of privacy and defamation claims, are entitled to their attorney fees on this appeal. However, the amount of such fees is to be determined by the trial court upon motion by defendants. (*Church of Scientology v. Wollersheim, supra*, 42 Cal.App.4th at pp. 659–660.)

## DISPOSITION

The trial court's granting defendants' anti-SLAPP motion is affirmed. Defendants are awarded their costs on appeal.

Turner, P. J., and Armstrong, J., concurred.