Filed 8/28/15  White v. Edley CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WILDA WHITE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CHRISTOPHER EDLEY et al.,<br><br>        Defendant and Respondent. | A141212<br><br>(Alameda County<br>Super. Ct. No. RG13688585) |

Wilda White brought this action for defamation, deceit and breach of contract against former University of California Berkeley School of Law[1] Dean Christopher Edley, Jr., two law school employees, and the University of California Regents.  Edley and Boalt Administrative Assistant Ayn Lowry moved to strike the complaint's causes of action for libel per se under California's anti-SLAPP (strategic lawsuit against public participation) statute, Code of Civil Procedure section 425.16.[2]  All parties concede that White's allegations arose from protected activity within the meaning of the anti-SLAPP statute. The trial court granted the motion on the grounds that the allegedly defamatory statements were nonactionable and that they fell within the official duty privilege of Civil Code section 47, subdivision (a).  We affirm.

---

[1] Although in 2007 the law school changed its official name to UC Berkeley School of Law, we follow the complaint's practice of referring to it by the informal name Boalt Hall, or Boalt.  (See Lattman, P., *The Renaming of Boalt Hall*, WSJ Law Blog, Oct. 15, 2007.)

[2] Hereinafter section 425.16.

1

## BACKGROUND

Between December 2008 and June 2013, White was the executive director of the Thelton E. Henderson Center for Social Justice (the Henderson Center), a department at Boalt Hall. In April 2013 the law school decided not to renew White's appointment for the ensuing academic year. The decision was based, in part, on a public outburst by White at a gala welcoming prospective African-American students to Boalt. White spoke at the event and, rather than welcome the attendees, aired her personal disagreements with the University, told them the event was "a fraud," and warned them that attending Boalt would expose them to sexual harassment and racial hostility from faculty and students. White encouraged the prospective students to instead attend the "Justice School," a new law school she was originating.

Upon being informed her appointment would not be renewed, White sued Boalt faculty member and executive director of the Henderson Center Mary Louise Frampton for intentional infliction of emotional distress and deceit. The Frampton lawsuit alleged there was racial hostility at the law school in general and included specific allegations against Frampton, Dean Edley, and other Boalt faculty and staff. White accused Frampton of falsifying her June 2011 performance evaluation "by falsely and maliciously attributing to faculty members odious statements" about her, conspiring to falsify employee time sheets, fraudulently inducing White to work without pay during the summers of 2011 and 2012, and terminating her for reporting Frampton's alleged misconduct.

White discussed these allegations widely among students, faculty and peers. On June 14, 2013, she sent an email to the Boalt Hall community captioned "Berkeley Law Fires Henderson Center Executive Director Wilda White for Whistle blowing on Mary Louise Frampton—Race a Factor, Lawsuit Says." Her e-mail described her accusations of racism and fraud at Boalt and implicated the law school, Dean Edley and other law school officials in addition to Professor Frampton. White posted information about the Frampton complaint on her personal website, again referring specifically to the University of California, Dean Edley, and other faculty and staff. She also publicized her

2

allegations on her public blog and Twitter feed, and was quoted about her claims in The Daily Californian.

Not surprisingly, Dean Edley and others at Boalt received inquiries about White's claims from faculty, students and the media. Lowry heard students and faculty members discussing White's email and the lawsuit. For example, she observed students and faculty discussing the matter in the campus café, and on one occasion a student commented to her that it seemed like " 'half the Berkeley Law faculty was implicated.' " It was clear to Lowry that there was widespread interest in White's allegations.

Dean Edley eventually felt compelled to respond to White's public accusations and commentaries. On July 2, 2013, he drafted and sent a letter about White's litigation to "Members of the Berkeley Law Community." Edley chose recipients he believed would be interested given their connection to the law school. The letter, in full, stated:

"As many of you are now aware, we are regretfully involved in a contentious public dispute with Wilda White, the former executive director of Berkeley Law's Thelton Henderson Center for Social Justice. Because this is both a personnel matter and a subject of litigation, there are constraints on what I can say at this time, but I can and must broadly respond to what are utterly false allegations.

"First and foremost, I have complete faith in the current leadership and staff of the Henderson Center, particularly our faculty director, Professor Mary Louise Frampton. Their professional skills and values have been essential ingredients in the Center's success, the extent to which it has helped to advance the cause of social justice in neighboring communities and in this country, and the contributions the Center makes to Berkeley Law.

"Despite what you may have heard or read, Ms. White was not fired. For solely professional reasons, we made a decision not to extend or renew her employment contract, which ended on June 30th. We have already begun the process of searching for a new executive director, and I am confident that the Henderson Center's reputation and

3

the support it enjoys on- and off-campus will ensure a highly talented and diverse set of applicants.

"In so far as Ms. White's litigation and public statements are concerned, I want to refute in the strongest possible terms her allegations of racial bias, conspiracy and falsification of performance reviews. These claims are contradicted by the facts, as well as the first-hand experience so many of us have had working with Ms. White and with the individuals she has so unfairly targeted. Ms. White's [*sic*] has also made utterly baseless claims that students from under-represented minority groups are somehow unwelcome at Berkeley Law. Her claims are outrageous and offensive. Nothing could be further from the truth, as our faculty, staff, students and alumni can readily confirm.

"As with all such litigation, the matter is now the responsibility of the UC system's Office of General Counsel, which will handle the legal process going forward. We hope this will be resolved quickly, but of course we cannot control that. I will provide appropriate updates to you when I am able. Meanwhile, I deeply appreciate the expressions of support we have received from our community and distinguished members of the Henderson Center's advisory counsel."

In her role as administrative assistant, Lowry was asked to send Dean Edley's letter to the individuals on the Henderson Center's e-mail list "given that [White's] allegations implicated the Henderson Center and its faculty." The Henderson Center used "Constant Contact" software to inform its constituency, so Lowry used it to disseminate Dean Edley's letter by selecting as recipients groups and individuals who were personally connected to the Center. Lowry, whom the complaint accused of cooperating in Frampton's alleged fabrications and fraudulent conduct, disputed those allegations and believed that Edley's response was appropriate, warranted and truthful. However, she was not involved in drafting the Dean's letter and provided no input into it.

White sued Edley and Lowry for "defamation-libel per se,"[3] alleging the Dean's letter falsely accused her of being untruthful when it described allegations in the

---

[3] Other causes of action against the U.C. Regents and Frampton are not at issue in this appeal.

4

Frampton complaint as "utterly false," "utterly baseless," and "outrageous and offensive." White identified as provably false statements Edley's comments "(1) that defendant Frampton did not falsify plaintiff Wilda L. White's July 2011 performance evaluation; (2) that defendant Frampton did not attempt to conspire with plaintiff Wilda L. White and her colleagues to cause the submission of fraudulent time sheets; and (3) that there is not a significant number of non-white students who sense a climate of racial hostility at Boalt Hall." She alleged Lowry disseminated the Edley letter "of her own volition and with her own personal motives for doing so," while knowing that at least some of Dean Edley's statements were false and that he was falsely accusing White of being untruthful.

Edley and Lowry moved to strike the complaint under section 425.16 on the grounds that the allegations against them arose from protected speech and there was no reasonable probability that White would prevail. The trial court agreed. It found, as White conceded, that the action arose from an act in furtherance of free speech and was therefore subject to the anti-SLAPP statute. Turning to whether White had demonstrated a probability of prevailing on her claims, the court ruled that Dean Edley's statements were both nondefamatory and privileged under Civil Code section 47, subdivision (a) as made in the discharge of an official duty. Accordingly, it dismissed the action as to Lowry and Edley. White filed this timely appeal.

## DISCUSSION

### I. The Anti-SLAPP Statute

Unmeritorious claims that are brought to thwart constitutionally protected speech or petitioning activity may be stricken pursuant to a motion filed under section 425.16. (See *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 102.) This anti-SLAPP statute provides: "(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue

5

shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] . . . [¶] (e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16.)

We consider an anti-SLAPP motion in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).)

We independently review the trial court's determinations as to whether the plaintiff has shown a probability of prevailing. (*ComputerXpress, Inc. v. Jackson* (2001)

6

93 Cal.App.4th 993, 999.)  An anti-SLAPP motion does not survive this prong " 'if the plaintiff presents evidence establishing a prima facie case which, if believed by the trier of fact, will result in a judgment for the plaintiff.  [Citation.]' " (*Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356.)  We neither " ' "weigh credibility [nor] compare the weight of the evidence.  Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' " (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1036 (*Nygard*).)  "In order to satisfy due process, the burden placed on the plaintiff must be compatible with the early stage at which the motion is brought and heard [citation] and the limited opportunity to conduct discovery." (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823, disapproved on other grounds in *Equilon, supra*, 29 Cal.4th at p. 68, fn. 5.)

## II.  Analysis

Although it is highly questionable whether Dean Edley's statements could be considered defamatory, White correctly concedes they were made in connection with litigation and therefore fall within the scope of section 425.16, subdivision (e)(2).  The issue before us, then, is whether White satisfied her burden of demonstrating a probability of prevailing on her allegations against Edley and Lowry.  She did not, because her defamation claims arising from the Edley letter are precluded by the official duty privilege under Civil Code 47, subdivision (a)[4].

In relevant part, section 47 states: "A privileged publication or broadcast is one made: . . . In the proper discharge of an official duty."  White contends Edley's position as dean of a public law school does not qualify him to invoke this privilege because "his job is essentially operational," his duties "reveal no governmental policymaking role," and he is not entrusted with any vital public functions.  Alternatively, she argues that even if the privilege generally may apply to a law school dean, Edley cannot invoke it

---

[4] Hereinafter section 47, subdivision (a).

7

here because he was not exercising a policy-making function when he circulated the allegedly defamatory letter. Her contentions are not persuasive.

*Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424 (*Morrow*) shows why. The court there applied the official duty privilege to immunize a school superintendent, immunizing him from liability for an allegedly defamatory announcement of the transfer of a high school principal. Like White in this case, the principal argued the privilege did not apply to the superintendent because he was not exercising a policymaking function when he issued the challenged statements. (*Id.* at p. 1442–1443.) The court disagreed. First, it concluded the privilege extends to comments by "lower ranking officials" such as the school superintendent. (*Id.* at p. 1441, citing *Barr v. Matteo* (1959) 360 U.S. 564 [absolute privilege applied to the acting director of the Office of Rent Stabilization]; *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 840 (*Copp*) [to a county emergency services coordinator]; *Royer v. Steinberg* (1979) 90 Cal.App.3d 490, 500-501 (*Royer*) [to school board trustees]; see also *Neary v. Regents of University of California* (1986) 185 Cal.App.3d 1136, 1142 (*Neary*) [a University of California Vice Chancellor, as an agent of the regents, "may indeed fall into the category of a state official who engages in policymaking"].) "As the Supreme Court explained in *Barr*: 'It is not the title of his office but the duties with which the particular officer . . . is entrusted . . . which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits.' " (*Morrow* at pp. 1441–1442.)

In view of these authorities, the evidence here satisfies us that Edley's substantial and wide-ranging duties as dean of a public law school qualify him for the privilege. Dean Edley is "the administrative head and academic leader of Berkeley Law." As the trial court observed, "Plaintiff's own evidence—the University's Academic Personnel Manual 240—broadly defines the Dean's duties as follows: 'An academic Dean is head of a Division, College, School, or other similar academic unit and has administrative responsibility for that unit. This assignment includes fiscal responsibility for the unit; responsibility for ensuring diversity of the faculty, students and staff, including

8

maintaining an affirmative action recruitment and retention program consistent with University affirmative action policies, Regental policy and applicable law; and responsibility for ensuring that system-wide and local policies, including Academic Senate regulations, are observed.' "

The trial court also noted academic commentary on the nature of a law school deanship: "The law school dean's duties involve accountability to a number of different constituencies, one or more of which may hold different perspectives on the dean's role in leading a law school. A dean must respond to the concerns of faculty members, law students, the law school's support staff, the law school's graduates, university administrators, donors and supporters, the bench and bar, and other friends of the law school. [¶] A law school dean serves as the law school's chief executive officer and chief academic officer. The position has been declared analogous to that of a president of a small college." (J. Griffith, *The Dean's Role As A Member of the University's Central Administration* (2003) 35 U.Tol.L.Rev. 79, 81-82.) We are satisfied that the dean of a preeminent public law school, no less than the school superintendent in *Morrow,* school board trustees in *Royer*, or county emergency services coordinator in *Copp,* holds a position of sufficient responsibility to qualify for the privilege afforded under Civil Code 47, subdivision (a).

We are also satisfied that Dean Edley wrote and disseminated his letter in the "proper discharge of an official duty" as required for invocation of the privilege. White argues the privilege applies only if "a public official [was] exercising policy-making functions when he or she made the alleged defamatory statements," while in her view Dean Edley's letter was merely about "the functioning of the Berkeley Law [sic], which falls within the category of routine, ministerial duties incident to the normal operations of running a law school." Not so. In *Copp, supra*, 45 Cal.App.4th at pp. 843–844, Division One of this court clarified the significance of this "policy-making" language, which appears in a number of cases. "The *Royer* decision states that the privilege applies only to communications made 'while exercising policy-making functions.' [Citation.] Similar

9

language is found in *Sanborn v. Chronicle Pub. Co.,* [citation], *Kilgore v. Younger,* [citation], and *Neary v. Regents of University of California,* [citation]. The *Saroyan* decision, however, speaks more broadly of acts 'in the exercise of an executive function . . .' (*Saroyan v. Burkett, supra,* 57 Cal.2d at p. 710.) This formulation better reflects the standard in *Barr v. Matteo, supra,* 360 U.S. 564 which asks whether the communication 'was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively.' [Citation.] It is not necessarily inconsistent with language referring to the 'exercise of policy-making functions' but calls for a broad interpretation of this language to encompass all discretionary acts essential to the proper exercise of an executive function. We regard the language of the *Saroyan* decision as best defining the parameters of the privilege." (*Copp* at pp. 843–844.) We agree.

Under this standard, the school superintendent's statements to the press in *Morrow* were privileged because "as superintendent he was publicly explaining the district's response to a matter of widespread concern, which was one of his official duties." (*Morrow, supra*, 149 Cal.App.4th at pp. 1442–1443.) So too here. No less than in *Morrow*, Dean Edley's public response to White's much-publicized allegations of fraud, conspiracy and racism against law school faculty and staff " 'was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." (*Id.* at p. 1442, quoting *Barr, supra*, 360 U.S. at pp. 574–575.) "Because a public official's duty includes the duty to keep the public informed of his or her management of the public business, press releases, press conferences and other public statements by such officials are covered by the 'official duty' privilege. . . ." (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1149, fn. 6.)

White attempts to distinguish *Morrow, Barr* and other seminal "official duty" cases on the ground that there the officials' duties were prescribed by statute, but none of those cases identify or state that the statutory nature of any official duty was the basis for extending the official duty privilege. White tries to distinguish *Copp* on the purported grounds that that law schools do not serve a "vital public function" and Edley was neither

10

appointed by nor reports to an elected official, but nothing in *Copp* or any of the other pertinent cases suggests these are meaningful distinctions. She also argues that *Neary, supra*, 185 Cal.App.3d 1136 teaches that only a University of California employee who is an agent of the University of California Regents may qualify for the official duty privilege. *Neary* holds no such thing, but no matter. There is no dispute that at all relevant times Edley was employed by the University of California and acted within the scope of his employment. "An employee is an agent" of his employer. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 669.)

White further contends that even if Edley is protected by the official duty privilege, Lowry, who disseminated his letter in her role as administrative assistant, is not. Here too, we disagree. The evidence establishes that all Lowry did was comply with a workplace request to distribute Dean Edley's letter to individuals on the Henderson Center's email list. As the trial court observed, the privilege attaches to the letter: "*A privileged publication or broadcast* is one made: (a) In the proper discharge of an official duty." (Civ. Code, § 47, subd.(a), italics added.) Given our conclusion that Dean Edley's letter is privileged under section 47, subdivision (a), we agree with the court's conclusion that Lowry's ministerial act of disseminating it as directed cannot expose her to liability for its contents. To hold otherwise would, practically speaking, eviscerate the privilege by exposing to liability any clerical employee (and presumably, under principles of respondeat superior, the employer) whose job it is to type addresses on envelopes or take mail to the mailroom. That cannot be the law.

*Neary, supra,* is not to the contrary. The court there held that the official duty privilege might shield a vice chancellor from liability for his decision to release an allegedly defamatory report, but did not extend to the veterinarians who researched and wrote the report. (185 Cal.App.3d at p. 1147–1148.) Lowry did not author the allegedly defamatory letter and its author is, as we have explained, shielded by the privilege, so *Neary* has no bearing. The court correctly dismissed White's defamation causes of action as against both defendants.

11

## DISPOSITION

The judgment is affirmed.

 

_____

Siggins, J.

We concur:

_____

Pollak, Acting P.J.

_____

Jenkins, J.