[No. A108712. First Dist., Div. Two. Jan. 10, 2006.]

TUTOR-SALIBA CORPORATION, Plaintiff and Appellant, v.
DENNIS J. HERRERA, as City Attorney, Defendant and Respondent.

**COUNSEL**

Castle & Associates, Nomi L. Castle and David Romyn for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Joanne Hoeper, Chief Trial Deputy, and James M. Emery, Deputy City Attorney, for Defendant and Respondent.

**OPINION**

**RUVOLO, J.—**

## I.

### INTRODUCTION

Plaintiff and appellant Tutor-Saliba Corporation (Tutor) appeals an order striking its complaint for defamation against defendant and respondent Dennis J. Herrera (Herrera), following Herrera's successful special motion to

strike brought under California's anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16.)[1] The motion was granted after the trial court concluded that the alleged defamatory statements made by Herrera in a speech before the San Francisco Chinese-American Democratic Club (CADC) were absolutely privileged under Civil Code section 47, subd. (a) (official duty privilege), as well as under Government Code sections 821.6 and 820.2 (prosecutorial immunity and discretionary immunity, respectively). We affirm, concluding that the alleged statements were subject to the official duty privilege.[2] We also conclude that the trial court did not err in denying Tutor's request for limited discovery, under section 425.16, subdivision (g).

## II.

### PROCEDURAL BACKGROUND

On February 19, 2004,[3] Tutor filed a complaint alleging a single cause of action for defamation against Herrera in San Mateo County Superior Court. Paragraph 8 sets forth quoted statements attributed to Herrera, which are alleged to be defamatory of Tutor. In response, Herrera filed a motion to change venue of the case to San Francisco.

While the motion to change venue was pending, Herrera filed a motion to strike Tutor's complaint on June 4 pursuant to section 425.16. The motion neither challenged the sufficiency of Tutor's complaint to state a cause of action for defamation, nor did it deny that the statements quoted in the complaint were actually made by Herrera. Instead, the motion contended that the complaint was filed in retaliation for Herrera's exercise of his constitutionally protected right of free speech in connection with a matter of public interest. Therefore, the complaint fell within the provisions of California's anti-SLAPP statute (§ 425.16, subd. (b)). In addition, Herrera asserted that the statements attributed to him were made concerning a federal lawsuit against Tutor filed by Herrera on behalf of the City and County of San Francisco and the State of California and, thus, they were privileged. Because the statements were privileged, Herrera contended that Tutor could not show a likelihood that it would prevail on the complaint's merits, and therefore, the motion to strike the complaint must be granted.

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

[2] Because we affirm on this basis, it is unnecessary for us to determine if either "prosecutorial immunity" or "discretionary immunity" also apply.

[3] All dates are in 2004 unless indicated otherwise.

On June 9, Herrera's motion to change venue to San Francisco was granted.[4]

On October 8, eight months after filing the complaint, Tutor filed an ex parte motion seeking limited discovery in connection with the pending motion to strike (§ 425.16, subd. (g)). That ex parte application was denied, without prejudice to renewing the motion at the hearing on Herrera's motion to strike. Tutor was also ordered to file its opposition to Herrera's motion by October 13, and any reply was to be filed no later than October 18. Accordingly, the hearing was continued to October 21. Tutor then filed an opposition to Herrera's motion[5] on October 13, and Herrera a reply brief on October 18.

Following a hearing on October 21, the trial court filed its order granting Herrera's motion to strike on November 5. This appeal followed.

## III.

### LEGAL DISCUSSION

### A. The Anti-SLAPP Statute and the Standard of Review on Appeal

We recently had occasion to discuss at considerable length California's anti-SLAPP statute, including the applicable standard of review. As we said in *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 644–645 [24 Cal.Rptr.3d 619]: "Section 425.16, commonly referred to as the anti-SLAPP law, provides in relevant part: '(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly. [¶] (b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special

---

[4] The granting of a change of venue is not an issue on appeal.

[5] Apparently, Herrera filed an amended motion to strike on September 20, after Tutor filed a first amended complaint (FAC) on September 17. However, neither party contends that the FAC materially changed the allegations of defamation against Herrera or the defenses of privilege raised in his motion to strike.

motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. [¶] (3) If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination. [¶] . . . [¶] (e) As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.'

■ "Under the statute, the court makes a two-step determination: 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§ 425.16, subd. (b)(1).) "A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)" [citation]. If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (§ 425.16, subd. (b)(1) . . . .)' (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703]; see also *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon Enterprises*); *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695].) 'Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 89.)

"A ruling on a special motion to strike under section 425.16 is reviewed de novo. (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 [84 Cal.Rptr.2d 303].) This includes whether the anti-SLAPP statute applies to the challenged claim. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892 [120 Cal.Rptr.2d 576].)

Furthermore, we apply our independent judgment to determine whether [plaintiff's] causes of action arose from acts by [defendant] in furtherance of [defendant's] right of petition or free speech in connection with a public issue. (*Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 721 [77 Cal.Rptr.2d 1], disapproved on another ground in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10 [81 Cal.Rptr.2d 471, 969 P.2d 564].) Assuming these two conditions are satisfied, we must then independently determine, from our review of the record as a whole, whether [plaintiff] has established a reasonable probability that he would prevail on his claims. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 653 [49 Cal.Rptr.2d 620], overruled on other grounds in *Equilon Enterprises, supra,* 29 Cal.4th at p. 68, fn. 5.)" *Thomas v. Quintero, supra,* 126 Cal.App.4th at pp. 644–645, italics omitted.)

### B. Herrera's Motion to Strike Was Properly Granted

Neither in the trial court nor on appeal does Tutor contend that the alleged defamatory statements described in its complaint were not "protected activity" within the meaning of section 425.16, subdivision (e). Thus, it was Tutor's burden in opposing Herrera's motion to demonstrate a probability that it would prevail on its defamation claim. (§ 425.16, subd. (b)(1).) The sole impediment to a showing that the claim had legal merit was Herrera's assertion that the statements were privileged under the "official duty" privilege (Civ. Code, § 47, subd. (a)), as well as under the "prosecutorial" and "discretionary" immunities. (Gov. Code, §§ 821.6 & 820.2.)

Undisputed facts presented in connection with the motion reveal that Herrera was first elected San Francisco City Attorney in December 2001, and took office in January 2002. On or about July 2, 2003, Herrera, together with outside counsel, filed a second amended complaint (SAC) for damages and penalties in case No. C-02-5286 CW in the United States District Court for the Northern District of California. The 73-page SAC contains 13 causes of action, and names Tutor and others as defendants. Claims asserted included violations of state and local false claims acts, violations of Racketeer Influenced and Corrupt Organization Act (18 U.S.C. § 1962), fraud, and breach of contract, among others. In summary, the SAC seeks to recover "tens of millions of dollars of public funds that the Tutor Defendants pocketed as the result of a pervasive and elaborate pattern or racketeering, false claims, fraud and unfair business practices perpetrated on several major construction projects at the [San Francisco International Airport]."

The allegedly defamatory statements attributed to Herrera were made on March 7, 2003, during a keynote address entitled "What Price, Justice?" at

the 2003 annual dinner of the CADC, which he attended in his capacity as city attorney. The full text of that speech was attached as appendix A. After an appropriate salutation to the host group, and a reference to a "string of eventful days at City Hall in the last week," Herrera explained that "here's the reason today was eventful for me," and began his comments relating to the federal litigation against Tutor, and recent action taken at City Hall in connection with the pending action:

"As you may or may not be aware, Mayor Brown this evening vetoed an ordinance that had been unanimously approved by the Board of Supervisors directing the Airport Commission to allocate $2.5 million for litigation against [Tutor].

"Within the Mayor's veto message is an opaque suggestion which *some* may read as *agreement* on my part in the Mayor's decision.

"To avoid confusion, I want to make this absolutely clear: I oppose the Mayor's veto.

"And I urge the members of the Board of Supervisors to do the right thing and stand by their votes in over-riding it.

"If you haven't heard much about the lawsuit, I'll fill you in on a few of the details.

"[Tutor] is a construction giant. In fact, it's one of the largest and most politically connected in the nation.

"Tutor contracted to manage construction of SFO's International Terminal and several related projects, winning approximately $1 *billion* in business from the City and County of San Francisco based largely on its joint participation with minority-owned businesses.

"What no one knew at the time—and what *no one* now denies—is that in many instances [Tutor] didn't *use* minority subcontractors to do work at the airport.

"Instead, it used minority front companies, while white-owned subcontractors got the bulk of work and proceeds. It did so . . .

"—To win an enormously valuable contract.

"—To cheat legitimate minority contractors of their fair share of work.

"—And to defraud a City program that has (for nearly two decades) ensured equal opportunity and fairness to minority- and women-owned businesses traditionally under-represented in municipal bidding."

Herrera went on to express his beliefs concerning the value of minority business preferences and his commitment to "our MBE/WBE program," indicating that he had filed legal actions against a number of companies and individuals "for attempting to defraud it." He pointed to his concern for the pernicious effect "MBE fraud" has on the community "like the kind that [Tutor] committed at SFO." He then turned to discuss another reason he filed suit against Tutor:

"*Another* reason is change-order fraud . . . .

"And make no mistake about it: the evidence is there.

"In fact, the evidence we've seen in San Francisco fits a similar pattern of fraud and false claims that was established against [Tutor] in Los Angeles . . . [w]here a court awarded the Metropolitan Transportation Agency $60 million in damages, fees and costs.

"Over the last several weeks, the Board of Supervisors has heard the evidence of my office's case against [Tutor]. And without a single opposing vote (with the support of every member of the board, in fact) they directed the Airport Commission to fund the litigation with $2.5 million out of the Airport's $60 million reserve fund. [¶] . . . [¶]

"Now to put this dollar amount in context: the sum requested to pursue [Tutor] for its fraudulent conduct is roughly equivalent to what the Airport Commission *itself* approved to fund a free luggage cart program in its customs area. [¶] . . . [¶]

"To argue that fiscal responsibility requires turning a blind eye to fraud is manifestly absurd. . . .

"To those who ask, 'What price, Justice?'—who question the value of enforcing our laws through the narrow lens of costs vs. benefits—let me give you an honest answer:

"Yes, going after fraud is expensive. . . . But *not* going after fraud is *more* expensive. [¶] . . . [¶]

"The fact is, the lawsuit my office is pursuing against [Tutor] and its joint venture partners at SFO is about *many* important issues:

"—It's about promoting equal opportunity.

"—It's about protecting taxpayer dollars.

"—It's about preserving the public trust.

"And, perhaps most important, it's about affirming the values we share."

Following his speech, the text was posted on the official Web site of the San Francisco City Attorney's Office, which was created and maintained at City Hall.

■ The so-called official duty privilege reposes in Civil Code section 47, subdivision (a), which states with remarkable succinctness: "A privileged publication or broadcast is one made: [¶] (a) In the proper discharge of an official duty."

Within the factual context of this case, the most important court decision impacting the question of whether Herrera's statements fell within the official duty privilege is *Kilgore v. Younger* (1982) 30 Cal.3d 770 [180 Cal.Rptr. 657, 640 P.2d 793]. Indeed, it is discussed and quoted by both parties in their respective briefs. *Younger* involved former state Attorney General Evelle Younger, who had commissioned a study of organized crime in California. The report named 92 persons suspected of involvement in organized crime, including Kilgore, who was identified as being engaged in an illegal book-making operation. (*Id.* at pp. 774–775.) The report was made public by Younger at a press conference during which he distributed copies to the media, and proclaimed that he "adopted" its findings. (*Id.* at p. 775.) Kilgore then sued for defamation and related torts.

In affirming judgment on demurrer entered in favor of Younger, the Supreme Court noted that the official duty privilege is absolute and applies to public statements made by high-ranking governmental officers in the discharge of their official duties. "The absolute privilege is extended to 'high-ranking state and federal officials, such as the President of the United States, the governor of any state or territory, cabinet officers of the United States and the corresponding officers of any state or territory' [citation] on the rationale that their ability to function would be impaired and society adversely affected

if they were not absolutely free of the threat of suit by the defamed seeking recompense for injury." (*Kilgore v. Younger, supra*, 30 Cal.3d at p. 778.)

Similar to the argument made in this case by Tutor, Kilgore claimed that Younger was "politically motivated" and was acting as a candidate when he held the press conference. The court rejected this contention, noting: "Younger's alleged activity, though it may well have been taken to produce a popular and appealing law enforcement image, was for all intents and purposes indistinguishable from actions initiated by public officials truly oblivious to the political ramifications of their moves. . . . Here, Younger called his press conference in his capacity as Attorney General, purported to act in such role throughout its duration and, at least as is here relevant, dealt exclusively with law enforcement issues. As such, it may not be said that his actions were outside the scope of his official duties, or that his motives were in fact improper." (*Kilgore v. Younger, supra*, 30 Cal.3d at p. 779.)

In *Royer v. Steinberg* (1979) 90 Cal.App.3d 490 [153 Cal.Rptr. 499], the Court of Appeal extended the official duty privilege to *all* state and local officials engaged in the policymaking process and to "any statement by a public official, so long as it is made (a) while exercising policy-making functions, and (b) within the scope of his official duties." (*Id.* at p. 501; see also *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 840 [52 Cal.Rptr.2d 831].)

Most recently, and factually the most analogous to this case, the Sixth District decided *Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1283 [89 Cal.Rptr.2d 60]. There, the Monterey County District Attorney was sued for declaratory and injunctive relief by a local school board member after issuing a press release charging the school board with minor violations of California's Brown Act (Gov. Code, § 54950 et seq.). Although the district attorney denied any intention to prosecute for the minor violations described in the press release, the court nonetheless found the privilege applied: "[T]he District Attorney issued a press release summarizing the results of an investigation of a complaint of alleged violations of the Brown Act. The District Attorney's ultimate decision neither to prosecute nor to file a civil action at the time does not, in our view, affect the application of the privilege in these circumstances." (*Ingram v. Flippo, supra*, 74 Cal.App.4th at p. 1294.)

These principles apply with great force to the case before us now. As city attorney, Mr. Herrera is an elected official who is vested with the authority to "[r]epresent the City and County in legal proceedings with respect to which it has an interest." (S. F. Charter, art. VI, § 6.102(1); see *id.*, § 6.100.) Included among his enumerated responsibilities are the following: "3. Whenever a cause of action exists in favor of the City and County, commence legal proceedings when such action is within the knowledge of the City Attorney

or when directed to do so by the Board of Supervisors, except for the collection of taxes and delinquent revenues, which shall be performed by the attorney for the Tax Collector; [¶] . . . [¶] 5. Make recommendations for or against the settlement or dismissal of legal proceedings to the Board of Supervisors prior to any such settlement or dismissal. Such proceedings shall be settled or dismissed by ordinance and only upon the recommendation of the City Attorney." (S. F. Charter, art. VI, § 6.102.)

From the admissible evidence in the record, it is undisputed that Herrera was invited to speak to the CADC as its keynote speaker, and he did so in his official capacity as city attorney. The subject of his speech was limited to pending litigation he had filed in federal court against a large contractor with the city. The litigation, both in scope and complexity, required a substantial appropriation by the city to fund it. Apparently, the board of supervisors had approved an appropriation of $2.5 million to cover the costs and attorney fees likely to be incurred in pursuing the federal action. However, Mayor Brown expressed his inclination to veto the appropriation, and intimated that Herrera was in agreement with his proposed veto.

■ Under these circumstances, Herrera, as city attorney, had the authority, if not the duty, to express his professional opinion about the justification for, and potential merits of, the protracted and expensive litigation he had initiated on behalf of the city,[6] as well as to make a public statement that he disagreed with the mayor's proposed unilateral action that would bring the case to a halt. While the language of his remarks was florid and certainly cast Tutor in an unfavorable light, the comments all concerned the claims being asserted in the federal action, and Herrera's professional opinion, as the municipal attorney entrusted with plenary power over that litigation, that the matter was well worth pursuing.

As such, we conclude that the alleged defamatory statements Herrera made concerning Tutor's business practices related to the policymaking he must necessarily perform as city attorney, and were within the scope of his duties. In this regard, we find nothing in the record that would materially distinguish the context of this case from either *Kilgore v. Younger, supra*, 30 Cal.3d 770, or *Ingram v. Flippo, supra*, 74 Cal.App.4th 1280, and we conclude that Herrera is entitled to the protection of the official duty privilege codified at Civil Code section 47, subdivision (a). Like the conduct in *Royer*, his response

---

[6] Tutor suggests that the record is not clear as to whether the decision to sue Tutor in federal court was based on Herrera's own initiative, or at the direction of the board of supervisors, and consequently, his comments at the CADC were personal and not related to any policymaking function of the city attorney. We disagree. Whether the board directed the suit be filed or it came at Herrera's own choosing, the maintenance of such litigation is central to Herrera's official duties, including the decision to settle or dismiss, and thus, his comments were clearly within the ambit of his responsibilities.

" 'was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively.' [Citation.] Consequently, the policy of protecting officials from lawsuits which 'might appreciably inhibit the fearless, vigorous, and effective administration of [governmental] policies' took precedence. [Citation.]" (*Royer v. Steinberg, supra,* 90 Cal.App.3d 490, 501–502.)

Furthermore, we find the cases relied on by Tutor to be either inapposite or distinguishable. First, given the presence of controlling California precedent on the question before us, the authorities Tutor cites from the States of New York and Maryland[7] are unnecessary to the resolution of this issue, and are, thus, not authoritative.

Also, this case is not analogous to *Neary v. Regents of University of California* (1986) 185 Cal.App.3d 1136 [230 Cal.Rptr. 281], in which a vice chancellor at the University of California released a veterinarian's report investigating dead cattle at the plaintiff's ranch, or to *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406 [134 Cal.Rptr. 402, 556 P.2d 764], where a county clerk explained to the press that he had been "conned" by the plaintiff to release funds improperly. In those cases, the privilege was determined not to apply to the defendants' acts because they were not made in furtherance of any policymaking function. Essentially, the release of the veterinarian's report in *Neary* was ministerial and divorced from any policymaking role the vice chancellor might have had. Likewise, the county clerk in *Sanborn* had no policymaking function relating to the release of funds.

Nor does the recent Ninth Circuit case of *McQuirk v. Donnelley* (9th Cir. 1999) 189 Fed.3d 793, assist Tutor. In that case, the Sheriff of Glenn County allegedly made defamatory statements in providing an employment reference for a former employee. The statements were made five years after the employee had retired from the Glenn County Sheriff's Department. (*Id.* at p. 795.) Not surprisingly, the court concluded that answering requests for employment references is part of the ministerial, or operational, duties of any employer, and certainly did not relate to the policymaking, law enforcement functions of a county sheriff. (*Id.* at pp. 799–801.)

We also find *The Hale Company v. Lea* (1923) 191 Cal. 202 [215 P. 900], distinguishable. In that case, the director of the state laboratory was statutorily empowered to report findings relating to potential health hazards to the State Board of Health. In light of that function, the Supreme Court concluded that the director exceeded his authority and thus, was not protected under Civil

---

[7] *Cheatum v. Wehle* (1959) 5 N.Y.2d 585 [186 N.Y.S.2d 606, 159 N.E.2d 166]; *Ennis v. Crenca* (1991) 322 Md. 285 [587 A.2d 485].

Code section 47, subdivision (a), when he communicated facts ascertained by him outside of California, to the Washington Department of Agriculture. (191 Cal. at p. 207.)

For these reasons, on the record before it, the trial court was correct in granting Herrera's motion to strike. We then turn to Tutor's claim that it was unfairly restricted in opposing the motion because the trial court improperly denied Tutor's request for limited discovery.

### C. The Trial Court Did Not Abuse Its Discretion in Denying Tutor's Motion for Limited Discovery

We have already observed that, while Tutor's complaint was filed in February 2004, the motion seeking limited discovery, made by ex parte application, was made eight months later, which was four months after Herrera had filed his special motion to strike. However, while lack of timeliness was one of the grounds Herrera raised in opposition to the request, the trial court denied the motion on the basis that "Tutor had not identified any factual issue that it hopes to establish through the requested discovery that could affect the outcome of Herrera's anti-SLAPP motion to strike." Thus, the request was denied because the material requested was irrelevant to the issues raised by Herrera's anti-SLAPP motion.

Generally, discovery is closed once a motion to strike under section 425.16 has been filed. (§ 425.16, subd. (g).) However, the trial court may allow discovery limited to the issues raised by the motion to strike upon "a timely and proper showing in response to the motion to strike." (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 868 [44 Cal.Rptr.2d 46].) The "proper showing" includes "good cause" for the requested discovery. (§ 425.16, subd. (g).) "We review for abuse of discretion the trial court's decision as to whether a plaintiff has complied with the requirements of section 425.16, subdivision (g) to merit discovery prior to a hearing on the motion to strike. [Citations.]" (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1247 [132 Cal.Rptr.2d 57].)

Moreover, in considering whether the trial court abused its discretion finding a lack of good cause which would justify the discovery requested under section 425.16, subdivision (g), we note especially that " '[u]nder this standard the reviewing court will not disturb the trial court's decision unless it "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist., supra,* 106 Cal.App.4th at p. 1247.)

In his motion for discovery, Tutor enumerated five categories of discovery he sought including: (1) "Identity of persons and other entities to whom Herrera published statements related to the Federal Action and improper business practices by [Tutor]"; (2) "Communications and/or writings between Herrera [and his office] and third persons related to the Federal Action"; (3) "Communications and/or writings between Herrera [and his office] and San Francisco State University related to the Federal Action"; (4) "Communications and/or writings between Herrera [and his office] and California State Bar related to the Federal Action"; and (5) "Communications and/or writings between Herrera [and his office] and Chinese-American Democratic Club related to the Federal Action." As to each, Tutor asserted that the discovery was relevant "to establish identity of witnesses, knowledge of falsity of claims and malice," in addition to proving that the defamatory statements attributed to Herrera were actually made.[8]

Thus, the discovery sought by Tutor in its moving papers was purportedly needed to establish a prima facie case for defamation. However, as noted, Herrera neither denied making the statements attributed to him in the complaint, nor any of the other elements necessary to establish a prima facie claim for defamation against him. Herrera's position was that, even if Tutor could make out a prima facie claim of defamation, he had affirmative defenses to a prima facie case in the form of the absolute privileges he was asserting.

In fact, at the hearing on the motion for discovery, counsel for Tutor conceded that, in light of Herrera's position with regard to the prima facie case of defamation, "a lot of the discovery might be moot." When faced with the court's skepticism concerning the need for any discovery, and contrary to its moving papers, counsel then raised the argument that, "depending on the court's ruling here, and whether the court is finding that certain privileges apply," Tutor contended it was "entitled to [discovery] which can help establish that these privileges do not apply." That is, if the court determined that Herrera was acting in his official capacity, Tutor "should be able to explore" this question further.

In light of this record, the trial court was well within its discretion in denying discovery. The request sought discovery in order to prove the elements of a prima facie claim for defamation. As noted, a prima facie case for defamation was conceded by Herrera. Tutor's last minute attempt to argue that discovery was needed to "explore" the factual basis for Herrera's privilege claim was much too little, and came much too late.

---

[8] The potential relevance of discovery concerning communications with either the State Bar or San Francisco State University was never revealed by Tutor, either in the trial court or on appeal.

As to being too little, no attempt was made by counsel to explain what specific discovery was needed, and why it was needed. At best, counsel offered general comments that they should be able to explore and conduct discovery on what "exactly [Herrera's] duties are and whether his decision to speak at [CADC] fell within those official duties." Counsel also argued that discovery was needed to determine if the event hosted by CADC constituted a "public forum," under the anti-SLAPP law.

On this latter point, Tutor had already conceded that Herrera had satisfied the first prong of the anti-SLAPP law, and therefore, there was no need to address whether the CADC event was a "public forum." The belated showing was indeed irrelevant to the issue under consideration. As to the former point, Tutor made no showing whatsoever how the discovery was likely to lead to admissible evidence relevant to the privilege issue.

In many respects, this case is similar to the recent case of *Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903 [20 Cal.Rptr.3d 385]. In *Blanchard* an action was brought by recipients of letters sent by DIRECTV, a television provider, demanding that the recipients not use pirating devices. DIRECTV filed an anti-SLAPP motion to strike, asserting (1) the complaint arose from its demand letters, which were sent in anticipation of litigation and thus constituted an exercise of its right to petition, and (2) plaintiffs could not show a reasonable probability of success on their claims because the demand letters were immune from liability under the litigation privilege. (Civ. Code, § 47, subd. (b).) The trial court granted DIRECTV's motion to strike and dismissed the complaint, finding that DIRECTV's demand letters were absolutely privileged.

The Court of Appeal affirmed, finding that "plaintiffs' showing *failed to demonstrate prima facie* that they could overcome the litigation privilege." (*Blanchard v. DIRECTV, Inc., supra,* 123 Cal.App.4th at p. 922.) Moreover, the plaintiffs were not entitled to prehearing discovery of DIRECTV's business records. The court observed that since "plaintiffs did not demonstrate any other facts they expected to uncover in their discovery that would negate the privilege," the business records were irrelevant and the trial court did not abuse its discretion in denying discovery. (*Ibid.*)

Tutor's original request sought discovery on factual issues that were conceded by Herrera in Tutor's favor. Counsel admitted as much at the beginning of oral argument below. When it became evident that the court would likely rule against that request, counsel conjured an alternative argument in a desperate attempt to stave off the ruling. The court was within its discretion to reject it.

## IV.

### Disposition

The trial court was correct in granting Herrera's special motion to strike, and did not abuse its discretion in denying Tutor's request for limited discovery. The judgment is affirmed. Costs on appeal are awarded to Herrera.

Kline, P. J., and Haerle, J., concurred.