Filed 1/20/16  Yee v. City and County of San Francisco CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WALTER YEE et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>CITY & COUNTY OF SAN FRANCISCO,<br><br>　　　Defendant and Respondent. | A139922<br><br>(San Francisco City & County<br>Super. Ct. No. CGC13530290) |

　　　Plaintiffs Walter and Remona Yee appeal from a judgment of dismissal following the granting of the City and County of San Francisco's special motion to strike under Code of Civil Procedure section 425.16 (the "anti-SLAPP statute").

　　　This lawsuit follows several rounds of construction on the Yee's house in the Seacliff area.  The first occurred in the late 1990's, after an old City sewer collapsed, giving rise to a sinkhole.  The Yees sued the City for property damage and settled for $1.648 million.  They then obtained a building permit to repair the damage, which was signed off and "finaled" in 1999.  Ten years later, after the Yees got into a property line dispute with neighbors and the neighbors complained about additional construction, the City investigated, and concluded the Yees had made further additions to their house without the necessary permits.  This led to a series of notices of violation and abatement orders, and the Yees sought additional building permits and a variance, which were denied.  Although the Yees pursued an administrative appeal of the Planning Commission's adverse ruling and denial of their last-sought permit and variance, they

have never challenged these decisions, let alone successfully, in an administrative mandamus proceeding.

In 2012, the City issued an enforcement notice, and in 2013, notices of violation and penalties. The Yees filed this lawsuit one month after the issuance of the penalty notice, alleging causes of action for declaratory relief, injunctive relief, inverse condemnation, violation of title 42 United States Code section 1983 (taking without just compensation), negligent infliction of emotional distress, and intentional infliction of emotional distress. The first four causes of action contend the Yees had a right to make the additional improvements to their house pursuant to a promise the City allegedly made as part of the resolution of the sinkhole mess. The second two causes of action contend the Yees have been whipsawed by the City in connection with the repair of their house, initially approving and then disapproving the construction, including being wrongfully accused of misleading Planning Department officials and providing altered construction plans.

In the trial court, the City maintained a special motion to strike was proper because "the gravamen of the Yees' lawsuit relates to DBI's [Department of Building Inspection] and Planning's [Planning Department] permit, variance and enforcement actions" and "the determination that the Yees constructed additions to their Property without the benefit of permits and submitted false documents to DBI related to the construction." The latter assertion referred to the construction plans the Yees provided to the City during the investigation, which the Yees claim differed from the plans originally approved because of changes "in the field" necessitated and approved by City.

On appeal, the City acknowledges the first four causes of action challenge government administrative actions that are generally not the sort that can be characterized as "protected activity" under the anti-SLAPP statute. Instead, the City now focuses on the last two causes of action and maintains these are based on testimony by Planning Department officials before the Board of Appeal and, specifically, testimony that the Yees provided misleading plans to the investigator. The City thus maintains these causes of action arise from statements made during "official proceedings authorized by law" and

2

thus are subject to a special motion to strike. (Code Civ. Proc., § 425.16, subd. (e)(1).)[1] It further maintains these statements undergird the first four causes of action, as well, thus making all causes of action susceptible to a special motion to strike. We disagree and conclude the first four causes of action are not amenable to initial attack by way of a special motion to strike. We therefore affirm in part and reverse in part.

BACKGROUND[2]

*The 1998 Construction Following the Storm Water Damage*

In December 1995, sewer reconstruction activity and storm waters precipitated the collapse of one of the City's old brick-lined sewer tunnels in the Seacliff area, resulting in significant soil erosion and a large sinkhole. Both the ground failure and the City's repair efforts damaged neighboring properties, including the Yees' residence.

In August 1996, the Yees sued the City alleging multiple causes of action, including inverse condemnation, trespass, negligence and negligent infliction of emotional distress. The Yees alleged, among other things, that the City initially told them their house would have to be bulldozed, but ultimately it was stabilized. They claimed as losses, the "structural integrity of their residence and two levels, including the entire garage and its contents," a permanent reduction in value due to "stigma" associated with the ground failure, emotional distress, maintenance of an alternate residence, and costs of repairs and attorneys' fees.

In early 1998, the parties reached a settlement. The City paid the Yees $1.648 million dollars. The Yees executed a release of all claims of any kind "which have existed or may have existed, or which do exist, or which hereafter shall or may exist, and which (1) are alleged or set forth or attempted to be set forth in [the Yees' lawsuit], or (2) arise out of or are in any way related to any of the transactions, occurrences, acts or omissions set forth or alleged in any of the pleadings in [that lawsuit]." The Yees also

---

[1] All further undesignated statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] We grant the City's motion for judicial notice of transcripts, compact disks, and minutes of various hearings related to this action. (Evid. Code, §§ 452, 459.)

waived the protections of Civil Code section 1542, agreeing to release any claims of additional loss or injury "arising out of or in any way related to any of the events which gave rise to" the released claims.

The Yees also filed for a building permit (issued as no. 845616) to "[r]epair and restore" the "two story" residence "to its pre-damaged condition," which the Building Department approved in March 1998 (the "1998 permit"). While the City characterizes the plans as including "a new one story addition over the garage," the Yees maintain both the garage and addition were already in existence.

The Yees further maintain the City assured them its erosion and sinkhole repairs would include providing them with a new foundation for the part of their house damaged by the City's repair efforts and on which they would be able to rebuild the house "as it was prior to" the sewer collapse and erosion. However, over the course of its stabilization and repair work, the City made changes in its remedial efforts, which the Yees claim resulted in modifications to their own reconstruction plans and which the City allegedly approved at that time. According to the Yees, the City essentially told them they could "recapture" habitable living space that was lost due to the altered repair plans by adding living space elsewhere in the house.[3] The Yees claim the rebuilding of their house was done in phases and all of it was done permissibly pursuant to the 1998 permit, which they characterize as an "emergency permit."[4]

---

[3] The City maintains any modification to an approved construction plan must be made by way of a written revision request, subject to review and approval, and cannot be made at the construction site.

[4] In support of this assertion, the Yees submitted a copy of a June 13, 1998, note from their structural engineer to the Director of the Department of Building Inspection confirming restoration and repair of the house "without design details and restrictions as shown on the schematic drawings . . . permit no. 845616 and any necessary revisions until completion."

4

In any case, the 1998 permit was signed off and "finaled" (meaning, according to the City, the permitted work was completed and inspected) a year and a half later, in November 1999.[5]

### The Additional Work During the Mid-2000's

In mid-2008, the Building Department received complaints from neighbors that the Yees were making un-permitted additions to their residence.[6] This precipitated an investigation by Edward Sweeney, then Deputy Director for Inspection Services for the Department of Building Inspection. Sweeney observed the ongoing construction, including a two-story addition and a deck over the garage. Walter Yee provided Sweeney with plans showing the construction and indicated these were the plans that had been attached to the 1998 building permit.

After the inspection, one of the neighbors contacted Sweeney and claimed the plans Yee had given him were not, in fact, the plans that had been attached to and approved in conjunction with the 1998 permit. This neighbor also supplied satellite photographs of the Yees property ostensibly taken in 2002 and early 2008 which did not show the new construction.

Sweeney then researched the official plans and permits on file for the property. He determined the plans Yee had given him during the site inspection were not the same as the plans attached to the 1998 permit. The plans attached to the approved 1998 permit did not show the new construction Sweeney had observed.

Sweeney also found the Yees had obtained permits in 2004, 2005, and 2008 for completing work in connection with the 1998 permit.[7] No additional plans were attached

---

[5] Ten years later, the Planning Department concluded the plans approved in connection with the 1998 permit showed inaccurate property lines, site plans and floor plans, and violated building setbacks in connection with the construction above the garage.

[6] In a 2009 decision, the Abatement Appeals Board found there was an ongoing "property line dispute" between the Yees and a neighbor.

[7] For example, the 2004 permit application stated: "Reference made to original Application 9802662, Special Permit 845616, to restore & repair a 2-story single family

to these permit applications, and because the permits were for seemingly minor work in connection with all-ready approved plans (e.g., estimated job costs of $3,000 to $6,000), the permits were issued over the counter without review. However, according to Sweeney, the permits should not have been issued, since the 1998 permit had already been finaled and the Yees failed to disclose that in the applications. In any case, these permits were allowed to expire without any work being approved or finaled by the Department.

Following Sweeney's investigation, the Department of Building Inspection issued two Notices of Violation in July 2008, one for a "new third level added above garage" and one for a "horizontal bldg enlargement" at the southeast corner towards the rear of the property. In February 2009, the Department issued a third notice for a "south wall" not in compliance with plans and elevations not approved for "this rear area." The matters went to Director's Hearings, and following a hearing, the Director of the Building Inspection Department issued Abatement Orders.

The Yees appealed to the Abatement Appeals Board. Following a hearing, the Board upheld the Abatement Orders and allowed the Yees one year to obtain additional permits they were seeking for the new construction and to resolve a property line dispute with a neighbor. The Yees subsequently withdrew the applications. They claim they both filed and withdrew these permit applications at the City's suggestion. In the meantime, Planning Department personnel met with the Yees and with neighbors in connection with the permit applications and attempted to significantly scale back the unpermitted construction.

In January 2010, the Yees filed another permit application (No. 201001074358). The application stated it was: "[T]o revise, correct and update additions built w/o proper

residence to its pre-damaged condition prior to the Seacliff sewer incident. Specifically, this permit will update & restore the existing Sunroom & Terrace that was not finished. This restoration work will be in accordance with the original permit previously approved and issued. Other repair work at the residence by CCSF/DPW permits 793329, 799077, 809171 & 841459 is noted herein for reference to work performed & completed by the City of San Francisco."

6

Permits and Planning Department review under section 311 requirements. Alteration of existing single family dwelling to include 1) veranda @ 1st Flr. 2) Terrace & Study room @ 2d Flr. 3) Roof Deck @ 3rd Flr. and 4) Removal & rebuild portion of bldg. over property line at the rear S/E corner of the property. Reference is made to previous[ly] approved building Permit #9802662." The estimated job cost was $22,000. This application appears to have been initially or preliminarily approved.

In the course of reviewing the application, the Planning Department asked the Yees to submit revised plans that eliminated some of the new additions, and in revised plans, the Yees agreed to pull back the additions above the garage that were encroaching into the front setback area. However, they still needed a variance from the Zoning Administrator for encroachment into the rear setback area.

As a result of the public notice required for the variance, two neighbors filed a request for discretionary review (one of which was subsequently withdrawn), asking the Planning Commission to conduct a full review and hearing on the 2010 permit application and to disapprove the new additions. At the hearing, the Building Department urged approval consistent with the revised 2010 plans that had resulted from the department facilitated discussions.

The Commission, however, approved only "a modified project to legalize additions to the subject property built without benefit of a building permit." The Commission instructed staff to "approve the project pursuant to" the 1998 permit, "with exception to those portions that encroach over any property line. Those portions that encroach . . . shall be removed and pulled off of any property line by a minimum of one linear foot; and the addition over the garage shall seek and justify a variance or be set back a minimum of three feet three inches from the front property line." The Commission found, among other things, that the 1998 site and floor plans "are inaccurate and the project never received a variance from the front setback requirement," the Yees "knowingly built beyond the scope of work approved" under the 1998 permit "into the rear yard, side yard, and front setback," and the "illegal additions" violate the Planning

Code and "are out of scale with the existing character of buildings on the same block, across the street and in the neighborhood."

Following the Commission's decision, the Zoning Administrator denied the Yees' request for a variance. The Administrator found, among other things, there were no extraordinary circumstances resulting in unnecessary hardship not created by the applicant. Rather, the Yees had, themselves, "expanded the rear of the building without benefit of permit and now [sought] a variance to legalize this expansion; therefore, any practical difficulty or unnecessary hardship was created by" the Yees.

The Yees then asked the Planning Department to deny their 2010 permit application altogether so they could appeal to the Board of Appeals.

The Board of Appeals heard the matter in August 2012 and upheld the denial of the variance and denial of the 2010 permit application.

In December 2012, the Planning Department issued an Enforcement Notification demanding that the non-permitted additions be removed. On January 31, 2013, and March 12, 2013, respectively, the Department issued a Notice of Violation and Penalty, and a Notice of Penalty, for failure to remove the additions.

*This Lawsuit*

Two weeks after the issuance of the penalty notice, the Yees filed this lawsuit on April 3, 2013. They named as defendants the City, the Building Department, the Planning Department, and the Planning Commission (the latter three, according to the City, being "erroneously" named). They also included Doe defendants 1 through 50, alleged to be agents and employees of the named defendants.

The Yees alleged six causes of action. The first was for "declaratory relief." The Yees alleged they had initially been promised they would be able to rebuild their house exactly as it had been before the ground failure and sinkhole, but the City later concluded this would not be possible given the repairs it needed to make to shore up the area. The City then allegedly promised they could build out elsewhere, to "recapture" the habitable space they had lost. The Yees claimed this was an enforceable promise, and as a result, they were not required to obtain a variance or any other approval from the City, and their

8

additions were permissible and not subject to any investigation or enforcement action. Their second cause of action was for "injunctive relief" and claimed the Yees were unable to occupy and enjoy their house and were suffering irreparable harm.

Their third cause of action was for "inverse condemnation." The Yees alleged the City's initial approval of the scope of their construction and its subsequent reversal of position, resulted in a "substantial portion" of their residence being taken for public use without just compensation. The fourth cause of action was for a "taking" of their property purportedly actionable under 42 U.S.C. section 1983.

The fifth and sixth causes of action were for, respectively, negligent and intentional infliction of emotional distress based on their alleged travails with the City planning authorities for more than 18 years.

The City filed a special motion to strike under the anti-SLAPP statute. As for the "first prong" of the anti-SLAPP analysis, the City claimed the "gravamen" of the Yees' claims arose "from their dissatisfaction" with the permit, variance and enforcement actions taken in connection with their property, which included, according to the Yees, false statements they had mislead the Planning Department about the approved plans. Thus, all the claims, asserted the City, were "based on the City's exercise of first Amendment speech and petition rights" and subject to a special motion to strike. As for the "second prong" of the analysis, the City maintained the first through fourth causes of action were (a) barred by applicable limitations periods and res judicata because the Yees failed to successfully challenge the adverse determinations through administrative mandamus proceedings and (b) barred by the prior settlement and release in connection with the storm water and sinkhole damage. The City maintained the fifth and sixth causes of action were barred by statutory immunities under Government Code sections 818.4 (for decisions in connection with permit approvals or disapprovals), 818.6 (for inspection actions), and 818.8 (for employee misrepresentations), and by the litigation privilege.

The Yees maintained their claims were not based on any "protected activity" as to which a special motion to strike was proper. Rather, they were based on the fact the City

9

reneged on a promise the Yees could recoup habitable square footage they lost when the City had to alter its sinkhole repair plans by making additions elsewhere to the house. They further claimed they had made a showing on the merits sufficient to survive a special motion to strike.

The trial court granted the City's motion. The court ruled the City met its initial burden of showing its "actions in the permitting process" were protected activity under the anti-SLAPP statute. The court secondly ruled the Yees had not demonstrated a probability of prevailing on the merits. Specifically, the first through fourth causes of action were barred by the settlement and release executed in 1996, and the fifth and sixth causes of action were barred by Government Code section 818.4. The trial court did not rule on the City's demurrer, filed at the same time as its special motion to strike and based on the same substantive grounds.

## DISCUSSION

Section 425.16, known as the anti-SLAPP statute, provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) "The Legislature enacted the anti-SLAPP statute to address the societal ills caused by meritless lawsuits that are filed to chill the exercise of First Amendment rights. [Citation.] The statute accomplishes this end by providing a special procedure for striking meritless, chilling causes of action at the earliest possible stages of litigation." (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 443.)

" 'Under the statute, the court makes a two-step determination: "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§ 425.16, subd. (b)(1).) 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)' [citation]. If the court finds

10

that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (§ 425.16, subd. (b)(1). . . .)" [Citations.] "Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." [Citation.]' " (*Tutor–Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 609, italics omitted (*Tutor–Saliba*).)

An appellate court reviews an order granting or denying an anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325–326 (*Flatley*); *Schwarzburd v. Kensington Police Protection & Community Services District Board* (2014) 225 Cal.App.4th 1345, 1350 (*Schwarzburd*.) This includes whether the challenged activity is "protected." (*Tutor–Saliba*, *supra*, 136 Cal.App.4th at p. 609.) We also independently determine whether plaintiffs established a reasonable probability of success on their claims. (*Id*. at p. 610.) " 'We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' [Citation.]" (*Flatley*, *supra*, 39 Cal.4th at p. 326.)

*The First Four Causes of Action*

The Yees claim their first four causes of action—for declaratory and injunctive relief, and inverse condemnation and a "taking"—are based on the City's alleged breach of a promise that they could "recapture" habitable space they had lost and on their inability to fully occupy their house, none of which is "protected" activity under the anti-SLAPP statute. The City maintains, in turn, "each of these four causes of action is premised, in substantial part, on the Yees' dissatisfaction with statements made by City employees during administrative hearings . . . " and thus are based on "protected" speech.

11

The anti-SLAPP statute applies only to causes of action "arising from" protected activity—that is, activity "in furtherance of a person's right of petition or free speech under the United States or the California Constitution in connection with a public issue." (§ 425.16, subds. (b)(1), (e); *Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154, 160 (*Marlin*).) Such activity includes:  "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e); *Marlin*, at p.160.)

The "arising from" requirement is not satisfied simply because there is some relationship between the cause of action and protected activity.  "Fortunately the cases suggest a more concrete test: a cause of action arises from protected conduct if the wrongful, injurious act(s) alleged by the plaintiff constitute protected conduct."  (*Old Republic Construction Program Group v. Boccardo Law Firm, Inc*. (2014) 230 Cal.App.4th 859, 868.)  Thus, "the mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)  Even if a cause of action is "triggered" by protected activity, that does not mean the lawsuit arises from it. (*Ibid.*)  Rather, "the critical consideration is whether the cause of action is based on the defendant's protected free speech or petitioning activity."  (*Ibid*.)

A "public official or government body, just like any private litigant, may make an anti-SLAPP motion where appropriate." (*San Ramon Valley Fire Protection District v. Contra Costa County Employees' Retirement Association* (2004) 125 Cal.App.4th 343, 353 (*San Ramon*).)  There is also "support for the argument that the protection accorded by the anti-SLAPP statute extends to statements made by public officials at an official

12

public meeting, and perhaps also to their votes." (*Ibid*.) However, "the fact that a complaint alleges that a public entity's action was taken as a result of a majority vote of its constituent members does not mean that the litigation challenging that action *arose from* protected activity, where the measure itself is not an exercise of free speech or petition. Acts of governance mandated by law, without more, are not exercises of free speech or petition. '[T]he defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]' [Citation.]" (*Id*. at p. 354.)

The City concedes "acts of governance mandated by law . . . are not subject to the anti-SLAPP statute" and correctly recognizes the anti-SLAPP statute is inapplicable to lawsuits against a government entity for acts of governance, even though some government speech is necessarily incidental to the government action.[8] (See *San Ramon*, *supra*, 125 Cal.App.4th at p. 357 [anti-SLAPP statute did not apply to a suit against a county retirement board for voting to charge the fire district "more for certain pension contributions than the District believes is appropriate"]; *Schwarzburd*, *supra*, 225 Cal.App.4th 1345, 1355 [anti-SLAPP statute does not apply to suit against local police board for unlawfully approving a retroactive pay increase to police chief]; *Graffiti Protective Coatings*, 181 Cal.App.4th 1207, 1224 [anti-SLAPP statute did not apply to suit alleging city failed to follow laws relating to competitive bidding].)

The City maintains, however, that "[e]ach of these four causes of action is premised, in substantial part, on the Yees' dissatisfaction with statements made by City employees during administrative hearings that the Yees engaged in unpermitted construction, used falsified building plans, and otherwise provided false information to City departments." Thus, City claims the causes of action "arise[] in substantial part

---

[8] While the City claims the Yees have waived the argument that their lawsuit challenged "a final government decision" and not protected speech, the Yees sufficiently raised the issue, asserting in their opening brief that the "gravamen of the case is a taking without due process." Moreover, on appeal we "review the record independently to determine whether the asserted cause of action arises from activity protected under the statute. . . ." (*Schwarzburd, supra,* 225 Cal.App.4th 1345, 1350.)

13

from a challenge to speech [and are] subject to an anti-SLAPP motion even if it also concerns a governmental act," relying on the assertedly "analogous" case of *Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713 (*Mission Oaks*) [disapproved on another ground in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn.10].)

In *Mission Oaks*, a developer applied to the County of Santa Barbara to subdivide and develop property. (*Mission Oaks*, *supra*, 65 Cal.App.4th at p. 718.) After issuing a "request for proposal" to nine independent consultants to prepare the environmental impact report (EIR), the county contracted with Envicom, which was to "exercise its own independent judgment in accord with county guidelines," in preparing the EIR. (*Id*. at p. 719.) Mission Oaks agreed "that the adequacy of performance of consultant . . . shall be determined at the sole discretion of County," and that "final authority on all decisions concerning the preparation of contractual documents lies in the sole discretion of County." (*Ibid*.) The contract between the county and Envicom stated in part: " '[T]he draft EIR . . . and the final EIR must reflect the . . . County's independent judgment. . . . Accordingly, the final responsibility and final authority on all questions concerning the content and quality of the EIR lies in the sole discretion of the County. . . . Consultant understands and agrees that its responsibility to provide a complete and accurate EIR is owed solely to County . . . and not to Applicant. . . .'" (*Ibid*.)

Envicom prepared an EIR which listed "a multitude of significant adverse unmitigable impacts presented by the project. . . ." (*Mission Oaks*, *supra*, 65 Cal.App.4th at p. 719.) Mission Oaks sued, claiming that Envicom and County "engaged in a conspiracy to commit fraud by predetermining that it would reject the project and . . . [that] County owed and breached its duty to Mission Oaks to comply with CEQA in preparing the EIR, . . . [asserting] it is a third party creditor beneficiary to the contract between the County and Envicom." (Id. at p. 722.) Mission Oaks further alleged "the consultants collusively prepared the EIR with the County in derogation of law and without factual support as part of a conspiracy to deny Mission Oaks the right to develop its property." (*Id*. at p. 720.)

14

The court held "Mission Oaks is simply a disgruntled developer that does not like the findings prepared by the independent environmental consultants for the County and the public. Mission Oaks seeks to stifle the EIR . . . [and] coerce the County and the consultants to change their views on the development proposal." (*Mission Oaks*, *supra*, 65 Cal.App.4th at 729.) "The anti-SLAPP statute is designed to preclude such attempts to silence those who speak out on matters of public interest before legislative bodies." (*Ibid*.) As the court in *San Ramon* noted, the *Mission Oaks* "suit arose out of the submission of the environmental impact report to the county, and the court not surprisingly held that this act constituted speech in connection with an issue of public concern under consideration by a legislative body." (*San Ramon*, *supra*, 125 Cal.App.4th at p. 357.)

In contrast, the first four causes of action in this case did not arise from protected speech, but from alleged "acts of governance" and primarily from the City's alleged breach of a promise that the Yees could restore the habitable space in their home. (*San Ramon*, *supra*, 125 Cal.App.4th at p. 354.) Simply because some speech occurred in connection with the City's actions does not transform those actions into protected exercises of free speech or petition. Contrary to City's assertion, the gravamen of Yees' claims is not their "dissatisfaction with statements made by City employees during administrative hearings," but rather, their dissatisfaction with the City's reneging during the course of the protracted administrative proceedings on an alleged promise to allow them to "recoup habitable square feet" lost when the City altered its sinkhole repair plans.

Because the first prong of the anti-SLAPP statute was not satisfied as to the first four causes of action, the City's special motion to strike should have been denied as to those causes of action.

### The Last Two Causes of Action

In contrast to the first four causes of action, the Yees' fifth and sixth causes of action—for negligent and intentional infliction of emotional distress— were primarily based on the speech of City employees. The Yees alleged they suffered emotional distress due to the City's "suggestion that [they] somehow were complicit in efforts by

15

unknown persons to falsify planning documents," the City's "false accusations against the plaintiffs [and] disavow[als of] any knowledge or responsibility for the approvals that plaintiffs had relied upon, . . .[and] the City's "accusations and insinuations." The Yees further alleged the City intended to cause them emotional distress "or there was a reckless disregard of the probability that [they] would suffer emotional distress, knowing that their remarks would be taken into consideration by the various boards and agencies of the City. . . ."

"[I]t is clear, in light of both the language and purpose of California's anti-SLAPP statute, that the statutory remedy afforded by section 425.16 extends to statements and writings of governmental entities and public officials on matters of public interest and concern that would fall within the scope of the statute if such statements were made by a private individual or entity." (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 17 (*Vargas*).) Section 425.16 "extends to public employees who issue reports and comment on issues of public interest relating to their official duties. Where, as here, a governmental entity and its representatives are sued as a result of written and verbal comments, both may move to dismiss under section 425.16." (*Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1114–1115.) The Yees do not dispute that their emotional distress causes of action are based on statements made by City employees relating to their official duties at "official proceedings authorized by law." (§ 425.16, subd. (e)(1).)

The burden thus shifted to the Yees to produce sufficient admissible evidence to establish the probability of prevailing on the merits on their causes of action for emotional distress. (*Schwarzburd*, *supra*, 225 Cal.App.4th at p. 1350.) " 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.]' " (*Vargas, supra,* 46 Cal.4th at pp. 19–20.)

The Yees did not carry their burden in this regard. Among other problems they face, the actions of the planning department officials who investigated and reported on

16

the permitting situation of the Yees' property, including stating the plans the Yees produced during the investigation differed from the plans that had been approved by the City, are subject to immunities under the Tort Claims Act.[9]

For example, Government Code section 821.6, provides, "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." (Gov. Code § 821.6.) This immunity is not limited to prosecutors and law enforcement personnel, but has been applied to any public employee involved in investigative or prosecutorial functions (e.g., *Hardy v. Vial* (1957) 48 Cal.2d 577, 583 [school personnel investigating molestation allegations]; *Gensburg v. Miller* (1995) 31 Cal.App.4th 512, 518 [social worker investigating child abuse allegations]), heads of administrative departments (*White v. Towers* (1951) 37 Cal.2d 727, 732 [investigator of Fish & Game Department]), county coroners (*Stearns v. County of Los Angeles* (1969) 275 Cal.App.2d 134, 137), and members of county boards of supervisors (*Dawson v. Martin* (1957) 150 Cal.App.2d 379, 382). The immunity has been applied to a crime victim's claims against police officers for false imprisonment and intentional and negligent infliction of emotional distress. (E.g., *Amylou R. v. County of Riverside* (1994) 28 Cal.App.4th 1205, 1211–1212.) And similar to the present case, in *White v. Brinkman* (1937) 23 Cal.App.2d 307, 313–315, the immunity represented by section 821.6 was applied to a building inspector and a prosecuting attorney who plaintiff alleged maliciously and without probable cause investigated alleged building code violations and instigated a criminal prosecution against him. Likewise, in *Dawson v. Rash* (1958) 160 Cal.App.2d 154, 161, the immunity precluded any civil liability against a building inspector investigating purported building code violations.[10]

---

[9] The Yees' appellate briefing did not even respond to, let alone attempt to refute, the City's assertion of statutory immunities.

[10] Both *White* and *Dawson*, which predated the enactment of section 821.6, conferred upon the defendants the common law quasi-judicial immunity afforded public employees performing their duties in connection with the judicial process. Section 821.6

17

The Yees' emotional distress claims are based entirely on actions by the City's building inspection personnel while investigating and reporting on alleged code violations—actions taken in their official capacity as code enforcement officials and in the course and scope of their employment. Under section 821.6, no civil liability can be based on this conduct.

Government Code section 818.4 provides: "A public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or employee of the public entity is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." (Gov. Code, § 818.4.) Similarly, section 821.2 provides: "A public employee is not liable for an injury caused by his issuance, denial, suspension or revocation of, or by his failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where he is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." (Gov. Code, § 821.2.) Numerous courts have held that decisions to issue or deny building permits are quintessential discretionary actions protected by these immunities. (See generally *Thompson v. City of Lake Elsinore* (1993) 18 Cal.App.4th 49, 55.)

While the Yees attempt to segregate out the statements by building department personnel they contend unfairly impugned their character and caused them emotional distress, the comments were part and parcel of the administrative process by which their applications for a permit and variance were reviewed and denied. Accordingly, the immunities provided by sections 818.4 and 821.2 apply. (See *Freeny v. City of San Buenaventura* (2013) 216 Cal.App.4th 1333, 1341–1345 [allegations of fraud, corruption and malice did not preclude statutory immunities, including section 821.2, protecting

is a codification of that immunity. (See *Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 720-721.)

individual city council representatives who voted to deny conditional use permit and variance].)[11]

Thus, on statutory immunity grounds, alone, the Yees failed to demonstrate a probability of prevailing.[12] Accordingly, the trial court did not err in granting the City's special motion to strike as to the fifth and sixth causes of action.

## DISPOSITION

The judgment of dismissal is reversed as to the first four causes of action, and is otherwise affirmed. The parties are to bear their own costs on appeal.

---

[11] We need not, and do not, consider whether section 818.8, which provides that "[a] public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional," also applies. We note this immunity applies only to claims for deceit seeking damages for economic or financial loss. (See, e.g., *City of Costa Mesa v. D'Alessio Investments LLC* (2013) 214 Cal.App.4th 358, 383 ["[t]ort causes of action based on reputational harm (slander, trade libel, and intentional interference based on false statements to third parties) are not included within the "deceit" rubric identified by our Supreme Court when it interpreted Government Code sections 818.8 and 822.2"].)

[12] We therefore do not consider the other asserted deficiencies in the Yees' emotional distress claims.

19

_____
Banke, J.

We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.

A139922, *Yee v. City and County of San Francisco*